[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 15, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10698

_____

D. C. Docket No. 05-00522-CR-T-17-TGW

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN ANDREW DOCAMPO, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 15, 2009)

Before BARKETT, PRYOR and FARRIS,[*] Circuit Judges.

PRYOR, Circuit Judge:

---

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

The main question presented by this appeal involves the reasonableness of the sentence of a young adult who was arrested in a sting operation that involved the armed robbery of a fictional stash house of cocaine and who later threatened a witness who testified against him. The question is whether the district court abused its discretion when it sentenced John Andrew Docampo Jr. to a term of imprisonment of 270 months, instead of the mandatory minimum term of 180 months that he requested, even though some conspirators pleaded guilty and received less severe federal sentences and other conspirators who were juveniles when arrested pleaded guilty as adults in state court and received terms of probation. At trial, Docampo was convicted of charges involving a conspiracy to possess and distribute cocaine and possession of a firearm in furtherance of that conspiracy. The district court sentenced Docampo to a term of 210 months, which was within the guidelines range, for the conspiracy charges and a consecutive mandatory minimum term of 60 months for possession of the firearm. Because the other conspirators either pleaded guilty and agreed to cooperate or were not prosecuted in federal court, we conclude that they are not similarly situated to Docampo and any disparity in sentences is warranted. See 18 U.S.C. § 3553(a)(6). Docampo's sentence is reasonable. Because Docampo's other arguments about the admission of hearsay, sentencing factor manipulation, and his request for a

2

minor role reduction all fail, we affirm his convictions and sentences.

## I. BACKGROUND

The sting operation was conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. On September 21, 2005, undercover agent Richard Zayas met Isail Reyes through a confidential informant. During the meeting, Reyes arranged for Agent Zayas to purchase a firearm from Christian Carmona. Agent Zayas again met with Reyes and the confidential informant on September 27 to discuss purchasing additional firearms and narcotics. During that meeting, Reyes stated that he had experience committing robberies that involved cocaine and could find other individuals with similar experience to assist him in a robbery.

On October 17, Agent Zayas met Reyes again, under the guise of purchasing a firearm, and told Reyes about a house used to store large amounts of cocaine. Agent Zayas asked if Reyes was interested in robbing the stash house. Reyes met with Agent Zayas on October 26 and agreed to rob the stash house.

On November 1, Agent Zayas and the confidential informant met with Reyes, Sebastian Luengas, and Louis Alex Gutierrez to discuss the robbery. Agent Zayas provided information about the stash house, including the procedure for delivering cocaine and the number of armed individuals inside the house. According to Agent Zayas's testimony, Reyes, Gutierrez, and Luengas "became

3

animated and engaged in conversation as to their plan as to how they were going to commit the robbery." They discussed being armed and the possibility of killing persons inside the house. Agent Zayas testified, "They stated they had pistols available at that point, but that they wished to obtain a rifle to also assist them in the robbery."

Agent Zayas agreed to meet Reyes and all other participants at Reyes's residence on November 3 to depart for the robbery. On that day, Agent Zayas sent the confidential informant to Reyes's residence to tell Reyes and the other individuals present, including Docampo, to meet Agent Zayas at Albertson's grocery store. Reyes, the confidential informant, Gutierrez, Luengas, Docampo, Carmona, and Davin Powell arrived at the grocery store in two vehicles and parked next to each other. Agent Zayas stood between the two vehicles and, through the open windows, provided information about the stash house to the individuals in the vehicles.

Docampo left one of the vehicles, approached Agent Zayas, and engaged the agent in a conversation about the robbery. Agent Zayas testified that Docampo "took over the conversation and began to express his views of how he saw the robbery." According to Agent Zayas, Docampo "began to say what should occur, based upon his experience. He stated that . . . he had been involved in [robberies]

4

before."

After the conversation with Docampo, Agent Zayas confirmed that all present wanted to participate in the robbery, and Agent Zayas instructed them to follow him to a warehouse where they would later deliver his portion of the proceeds from the robbery. Docampo shook hands with everyone in the vehicle, and Agent Zayas then led the two vehicles to a storage facility. When they arrived at the storage unit, Agent Zayas told Reyes that he had received a page from the individuals at the stash house and went to make a phone call.

The tactical team attempted to surround and arrest the suspects, but the agents were unable to secure one avenue of escape. Reyes, along with Agent Zayas, ran from the area. While Reyes was attempting to elude the agents, Agent Zayas saw him remove a pistol from his pants and throw it over the perimeter wall of the storage facility. Reyes was arrested later by the Sheriff's Office of Hillsborough County. Docampo, Carmona, Luengas, Gutierrez, and Powell were arrested at the scene.

Docampo, Gutierrez, and Reyes were indicted for conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii), possession of firearms in furtherance of the conspiracy, 18 U.S.C. § 924(c)(1)(A), and conspiracy to possess firearms in furtherance of a drug trafficking crime, id. § 924(o). The

5

charges of drug conspiracy and firearm possession against Docampo were dismissed based on violations of the Speedy Trial Act, but Docampo, Gutierrez, and Reyes were indicted again a month later on identical charges.

Gutierrez and Reyes pleaded guilty and testified against Docampo. Powell, Luengas, and Carmona were juveniles when arrested but were prosecuted in state court as adults. Luengas and Powell pleaded guilty and were sentenced to terms of probation. Carmona was killed in an unrelated crime.

At trial, Docampo was convicted of all charges. Edwardo Lorenzo testified that Luengas, in the presence of Docampo, invited him to participate in a robbery and, when he declined the invitation, Docampo asked if he could borrow a gun from Lorenzo. Lorenzo identified the gun that Reyes threw behind the wall of the storage facility as the firearm Lorenzo lent Docampo. Lorenzo also testified about a phone call Docampo made to Lorenzo's girlfriend during which Docampo told Lorenzo's girlfriend that "[e]ither bad things would happen to [Lorenzo] or somebody that [he] was close to if [he] was to testify." Docampo objected to the testimony as hearsay, but the district court overruled the objection. Powell testified that Docampo was a willing participant in the planning of the robbery of the stash house. Gutierrez testified that Docampo brought a gun with him on the day of the robbery and volunteered to take a more active role in the robbery.

6

Video and audio evidence of the meetings confirmed the testimonies of Agent Zayas and the other witnesses.

The presentence investigation report stated that, based on the amount of cocaine involved, Docampo had a base offense level of 34, which was increased by two levels for obstruction of justice based on the threat to Lorenzo's girlfriend. The report provided a total offense level of 36, a criminal history of I, a guideline range of 188 to 235 months of imprisonment for the conspiracy charges, and a consecutive mandatory minimum sentence of 60 months of imprisonment for the charge of possession of a firearm. Docampo challenged the enhancements, argued that he was a victim of sentencing factor manipulation, and sought a reduction in his offense level based on his minimal role.

At Docampo's sentencing hearing, Dr. Michael Maher testified that, when the sting operation occurred, Docampo functioned at the level of a 16- or 17-year-old instead of his actual age of 18 and was more inclined to engage in risky and morally questionable behavior than a young adult. Dr. Maher testified that Docampo was easily susceptible to the robbery scenario, but knew the difference between right and wrong and understood the legal consequences of bringing a firearm to a robbery. Reyes testified that Docampo was not supposed to participate in the robbery, but showed up and insisted that he had experience with robberies

7

and wanted to participate.

Before the sentencing hearing, Docampo filed a sentencing memorandum in which he admitted that he had called Lorenzo's girlfriend before trial and was upset about Lorenzo testifying against him. Docampo also admitted that he had called Lorenzo's girlfriend back five or ten minutes later to apologize. At the sentencing hearing, Agent Michael Gistinger testified that he spoke to Lorenzo about the threatening phone call Docampo made to Lorenzo's girlfriend. Agent Gistinger also spoke to Lorenzo's girlfriend, who was reached at a phone number provided by Lorenzo, and she confirmed that she had received two calls from Docampo. Agent Gistinger testified that Docampo threatened Lorenzo and his family if he testified, and both Lorenzo and his girlfriend felt threatened.

The district court sentenced Docampo to 210 months of imprisonment for the conspiracy counts to be followed by the mandatory minimum sentence of 60 months of imprisonment for the firearms conviction. Docampo requested that the district court impose a sentence of 180 months, which was comprised of a mandatory minimum term of 120 months for the conspiracy charges and a mandatory minimum term of 60 months for the charge of possession of a firearm. The district court denied Docampo's request and stated that it had considered "the advisory sentencing guidelines and all of the factors identified in Title 18 United

States Code, Section 3553(a)(1) through (7)" and concluded "that the sentence imposed [was] sufficient but not greater than necessary to comply with the statutory purposes of sentencing."

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal. "We review evidentiary rulings for an abuse of discretion." United States v. Henderson, 409 F.3d 1293, 1297 (11th Cir. 2005). Even if the ruling was an abuse of discretion, it will not result in a reversal of the conviction if the error was harmless. United States v. Church, 955 F.2d 688, 700 (11th Cir. 1992). Factual findings that underlie the sentence, including the defendant's role in the offense, are reviewed for clear error. United States v. Rodriguez De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc). We review de novo the application of the Sentencing Guidelines to those facts by the district court. United States v. Massey, 443 F.3d 814, 818 (11th Cir. 2006). We review a criminal sentence for reasonableness. United States v. Booker, 543 U.S. 220, 261, 125 S. Ct. 738, 765–66 (2005). "The reasonableness of a final sentence is reviewed only for an abuse of discretion." United States v. Williams, 526 F.3d 1312, 1321 (11th Cir. 2008) (per curiam). "Review for reasonableness is deferential." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). This deferential review evaluates "whether the sentence

9

imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a)." Id.

### III. DISCUSSION

Our discussion is divided in three parts. First, we address whether the admission of the testimony of a witness at trial was error sufficient to warrant reversal of Docampo's conviction. Second, we discuss Docampo's challenges to the calculation of his sentence. Third, we consider the reasonableness of Docampo's sentence. We do not discuss Docampo's argument that his sentence is unconstitutional because it was enhanced based on facts not proved to a jury beyond a reasonable doubt; that argument is foreclosed by precedent. See United States v. Thomas, 446 F.3d 1348, 1354–55 (11th Cir. 2006).

*A. The Error of Admitting Hearsay About Docampo's Threat Was Harmless.*

Docampo argues that the district court erred when it allowed Lorenzo to testify about the threatening phone call that Docampo made to Lorenzo's girlfriend. Lorenzo's girlfriend did not testify. Docampo objected to Lorenzo's testimony as hearsay, but the district court overruled the objection.

We agree with Docampo that Lorenzo's testimony about the threat was hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

10

asserted" and is inadmissible unless the statement falls within an exception or exclusion provided by the Federal Rules of Evidence. Fed. R. Evid. 801. Because Lorenzo testified about a statement made by his girlfriend that was offered to prove that Docampo made threats against Lorenzo, the statement was hearsay. The district court stated that it allowed the testimony because Docampo had "opened up the door," but on appeal the parties agree that Docampo had not invited this testimony.

The government contends that the testimony is excluded from the prohibition against hearsay because Lorenzo's girlfriend was acting as Docampo's agent when she made the statement and, alternatively, Docampo had authorized the statement when he spoke with Lorenzo's girlfriend, but we disagree. Although the Federal Rules of Evidence permit the admission of statements made by an agent of the defendant, Fed. R. Evid. 801(d)(2)(D), or statements that are authorized by the defendant, id. 801(d)(2)(C), the government did not lay a foundation that Lorenzo's girlfriend was acting as Docampo's agent or that Docampo authorized the statement. The statements "are not alone sufficient to establish the declarant's authority under [Rule 801] subdivision (C) . . . [or] (D)." Fed. R. Evid. 801(d)(2). Because the testimony is hearsay and is not excepted under Rule 801, the district court abused its discretion when it admitted Lorenzo's testimony about the phone

11

call.

Although Lorenzo's testimony about his girlfriend's statement was inadmissible hearsay, we agree with the alternative argument of the government that the error is harmless. The admission of hearsay "alone . . . does not mandate a reversal of conviction: '[t]o require a new trial . . . [a] significant possibility must exist that, considering the other evidence presented by both the prosecution and the defense, the . . . statement had a substantial impact upon the verdict of the jury.'" United States v. Arbolaez, 450 F.3d 1283, 1290 (11th Cir. 2006) (per curiam). The government offered testimony by Agent Zayas and four cohorts about Docampo's involvement in the crime, an audiotape and video of Docampo's conversation with Agent Zayas on the day of the planned robbery, and a tape of Docampo's statements from his post-arrest interview. The hearsay did not have a substantial impact on the verdict.

B. *The District Court Correctly Calculated Docampo's Sentencing Range.*

Docampo challenges the calculation of his sentencing range on three grounds. First, Docampo argues that he was entitled to a reduction based on sentencing factor manipulation. Second, Docampo asserts that the district court erred when it enhanced his sentencing range based on obstruction of justice. Third, Docampo argues that he was entitled to a reduction based on his minimal role in

the offense.  These arguments fail.

### 1.  Sentencing Factor Manipulation

Docampo argues that the district court erred when it refused to sentence him below the statutory mandatory minimum based on sentencing factor manipulation. Docampo argues that his sentence was manipulated by the conduct of the federal agents.  Docampo argues that Agent Zayas "expanded the scope" of the original sting operation to include persons "unknown to him."  Docampo also argues that the inclusion of juveniles and Docampo, a young adult, in the sting amounted to sentencing factor manipulation by the government.

"[S]entencing factor manipulation occurs when the government's manipulation of a sting operation, even if insufficient to support a due process claim, requires that the manipulation be filtered out of the sentencing calculus." United States v. Ciszkowski, 492 F.3d 1264, 1270 (11th Cir. 2007).  "[S]entencing factor manipulation focuses on the government's conduct." United States v. Sanchez, 138 F.3d 1410, 1414 (11th Cir. 1998); Ciszkowski, 492 F.3d at 1270. The defendant must establish "that the government's conduct is sufficiently reprehensible[,]" and this "standard . . . is high." Ciszkowski, 492 F.3d at 1271. "[T]o bring sting operations within the ambit of sentencing factor manipulation, the government must engage in extraordinary misconduct." Id.  We have not yet

13

recognized a defense of sentencing factor manipulation or permitted its application to a defendant's sentence, and we do not do so in this appeal. Id.; United States v. Williams, 456 F.3d 1353, 1371 (11th Cir. 2006), abrogated on other grounds by Kimbrough v. United States, 128 S. Ct. 558 (2007) ("This is not to say that sentencing manipulation may never be a valid consideration in sentencing.").

Even if a sentence can be reduced based on sentencing factor manipulation, Docampo failed to establish that the agents involved in the sting engaged in "extraordinary misconduct." See Ciszkowski, 492 F.3d at 1271. Docampo argues that a sting operation against an 18-year-old who was not the intended target is government misconduct, but Docampo was an adult when the sting occurred and participated voluntarily. Docampo attempted to lead the criminal activity and told Agent Zayas what to expect during the robbery. That the sting operation involved a young adult who was not the original target does not amount to extraordinary misconduct by the government. See United States v. Bohannon, 476 F.3d 1246, 1252 (11th Cir. 2007) (the use of a fictional 15-year-old girl by the government "was no more manipulative than in any other sting operation" and did not constitute sentencing factor manipulation); Sanchez, 138 F.3d at 1414 (concluding the use of a large amount of drugs by the government in a sting did not result in sentencing factor manipulation).

14

## 2. Obstruction of Justice

Docampo argues that the district court erred when it enhanced his sentence based on obstruction of justice because the court considered unreliable hearsay. The presentence investigation report recommended an enhancement for obstruction of justice based on the threatening phone call Docampo made to Lorenzo's girlfriend. In addition to the testimony of Lorenzo at trial about the threat, Agent Gistinger testified at the sentencing hearing that he spoke with Lorenzo and his girlfriend about the phone call. Docampo admitted in his sentencing memorandum and at the sentencing hearing that he contacted Lorenzo's girlfriend twice by telephone and was upset about his best friend testifying against him, but Docampo denied making any threat. Based on this evidence, the district court enhanced Docampo's sentence by two levels.

Evidentiary requirements are more relaxed during a sentencing procedure, and reliable hearsay is admissible. "In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." United States Sentencing Guidelines § 6A1.3(a) (Nov. 2008). The district court did not make explicit findings about the reliability

15

of Agent Gistinger's hearsay testimony, but that failure "does not necessarily require reversal or remand where the reliability of the statements is apparent from the record." United States v. Gordon, 231 F.3d 750, 761 (11th Cir. 2000).

The reliability of the hearsay evidence about Docampo's threat is apparent from the record. Agent Gistinger's testimony about his conversation with Lorenzo's girlfriend is corroborated by Lorenzo's testimony during the trial, and this evidence is bolstered by Docampo's admissions that he made two phone calls to Lorenzo's girlfriend, was upset about Lorenzo testifying, and apologized in the second call for what was said during the initial conversation. Because the corroborating statements by Lorenzo and Docampo's admission that he made the phone calls to Lorenzo's girlfriend are sufficient to establish the reliability of Agent Gistinger's testimony, see Gordon, 231 F.3d at 760–61, "the district court's failure to make separate findings regarding the reliability of [this testimony] was not error." Id. at 761. The district court did not err when it enhanced Docampo's sentence based on his threatening phone call.

### 3. Minor Role Adjustment

Docampo argues that the district court clearly erred when it denied him a minor role reduction, but we disagree. A district court may reduce a defendant's offense level by four levels if the defendant was a "minimal participant" and by

two levels if the defendant was "a minor participant" in the crime. U.S.S.G. § 3B1.2. A minimal participant is "plainly among the least culpable of those involved in the conduct of a group." Id. cmt. n.4. "[T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." Id. According to the Sentencing Guidelines, "[i]t is intended that the downward adjustment for a minimal participant will be used infrequently." Id.

To determine whether Docampo was entitled to a reduction for a minor role, the district court had to consider (1) "[his] role in the relevant conduct for which []he has been held accountable at sentencing" and (2) his "role as compared to that of other participants in [his] relevant conduct." De Varon, 175 F.3d at 940. "The fact that a defendant's role may be less than that of other participants engaged in the relevant conduct may not be dispositive of role in the offense, since it is possible that none are minor or minimal participants." Id. at 944. To receive the role reduction, Docampo had to prove that he was "less culpable than most other participants[.]" Id.

Docampo argues that the district court erroneously considered evidence of his possession of a firearm as relevant conduct when it evaluated his role in the offense, but this argument is based on a misreading of the Sentencing Guidelines.

17

Docampo asserts that consideration of evidence of his firearm possession as conduct relevant to the drug conviction amounts to double counting of the firearm use, which is prohibited by the Sentencing Guidelines. Docampo relies on the following commentary in the Guidelines Manual, which is limited to the application of an enhancement:

> Weapon Enhancement – If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under 1.3 (Relevant Conduct).

U.S.S.G. § 2K2.4 cmt. n.4. This commentary says nothing about whether the district court, in denying Docampo a reduction for a minor role, was entitled to consider that Docampo obtained a firearm for the robbery.

Docampo's argument fails. Although the district court was prohibited from using the firearm to increase the base offense levels for the conspiracy charges, the district court was entitled to consider the firearm when evaluating Docampo's argument about a reduction for a minor role. The record establishes that Docampo was actively engaged in discussions about the logistics of the robbery, offered to take a more active role in the robbery, and repeatedly professed familiarity and

18

experience with similar robberies. Docampo was held responsible only for the offenses for which he was convicted, and he was not less culpable than the other conspirators. The district court did not clearly err when it found that Docampo played more than a minor role in the offense.

*C. Docampo's Sentence Is Reasonable.*

Docampo argues that his sentence of 270 months of imprisonment is unreasonable, but we disagree. A sentence may be procedurally or substantively unreasonable, United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006), and we address both aspects of Docampo's sentence.

1. Procedural Reasonableness

Docampo argues that his sentence was unreasonable because the district court did not "adequately and properly" consider the sentencing factors in section 3553(a) or his "arguments with respect to these factors." Procedural unreasonableness includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range." Gall v. United States, 128 S. Ct. 586, 597 (2007). Although the district court must provide some explanation for the

sentence, "nothing in <u>Booker</u> or elsewhere requires the district court to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." <u>United States v. Scott</u>, 426 F.3d 1324, 1329 (11th Cir. 2005).

Docampo's argument of procedural unreasonableness fails. Before imposing the sentence, the district court stated that it had heard and considered Docampo's arguments. The court then stated, "After considering the advisory sentencing guidelines and all of the factors identified in Title 18 United States Code, Section 3553(a)(1) through (7), the Court finds that the sentence imposed is sufficient but not greater than necessary to comply with the statutory purposes of sentencing."

Although the acknowledgment by the district court that it had considered Docampo's arguments and the sentencing factors of section 3553 "alone is sufficient in post-<u>Booker</u> sentences," <u>Scott</u>, 426 F.3d at 1330, the record reflects that the court also discussed the sentencing factors in detail before it imposed Docampo's sentence. The district court, for example, expressed concern about the potentially violent nature of the robbery in which Docampo volunteered to participate. The court questioned Dr. Maher, an expert in forensic psychiatry, about Docampo's knowledge of the charges against him, his responsibility level,

20

and his association with others who engaged in illegal activity. The district court expressed concern about the "tremendous upsurge of activity of people such as yourself who are youngsters, so to speak, but have the capability to go out and put themselves into volatile, violent situations." The court also discussed Docampo's prior work and educational history. The district court required Docampo and the government to discuss, on the record, which defendants had entered pleas and "who maintained the position of saying I'm not responsible." The court stated, "They [the other defendants] have a perfect right to go to trial – all those people had a perfect right to go to trial. They admitted their guilt." The court acknowledged that several of the juvenile defendants had been charged in state court as adults. The district court did not commit a procedural error in sentencing Docampo.

## 2. Substantive Reasonableness

Because Docampo's sentence is "procedurally sound," we now "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances . . . ." Gall, 128 S. Ct. at 597. We have acknowledged "that there is a range of reasonable sentences from which the district court may choose, and when the district court imposes a sentence within the

21

advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." Talley, 431 F.3d at 788.

Docampo argues that his sentence is substantively unreasonable when contrasted with the less severe sentences his other conspirators received. Reyes, a target of the sting, entered a plea agreement with the government before trial and pleaded guilty to conspiracy to possess with intent to distribute cocaine and possession of a firearm in furtherance of the drug conspiracy. In exchange for his testimony at Docampo's trial and other assistance, the government agreed to dismiss the remaining charges against Reyes and not oppose Reyes's request for a downward departure. The district court denied Reyes's requests for a departure and sentenced him to 168 months of imprisonment for the conspiracy conviction and 60 months of imprisonment for the firearms conviction, to run consecutively for a total term of imprisonment of 228 months, five years of supervised release, and a special assessment of $200. Gutierrez entered a plea agreement and agreed to plead guilty to the firearms charge and cooperate with the government in exchange for the dismissal of the other charges and a recommendation for a downward departure at sentencing based on substantial assistance. The district court sentenced Gutierrez to 60 months of imprisonment, which was the mandatory minimum term for the firearms count, five years of supervised release, and a

22

special assessment of $100. Luengas and Powell, who were juveniles at the time of the sting, were prosecuted in state court as adults and released on probation.

Although the district court is required "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), the other defendants who received less severe sentences were not similarly situated. We have held that defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial. Williams, 526 F.3d at 1323–24. There is no unwarranted disparity even when the sentence the cooperating defendant receives is "substantially shorter." Id. at 1323. "On a practical level, it would seem patently unreasonable to endorse a regime in which a defendant could steadfastly withhold cooperation from the authorities and then cry foul when a coconspirator benefits from rendering substantial assistance to the government." United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005). "Because [Docampo] did not provide any assistance to the government, there was no 'unwarranted' disparity between his and [Reyes's and Gutierrez's] sentences." Williams, 526 F.3d at 1324.

Docampo also asserts that his sentence was unreasonable based on the disparity between his federal sentence of 270 months of imprisonment and

Powell's and Luengas's sentences of probation in state court, but we again disagree. "A well-founded claim of disparity, however, assumes that apples are being compared to apples." Mateo-Espejo, 426 F.3d at 514. Powell and Luengas were juveniles when the sting occurred, were prosecuted as adults in state court, and pleaded guilty, but Docampo, who was 18 years old when he was arrested, was prosecuted in federal court and sentenced under federal law. Section 3553(a)(6) is concerned with unwarranted disparities in sentences among federal defendants. See United States v. Willis, 139 F.3d 811, 812 (11th Cir. 1998) (per curiam); United States v. Clark, 434 F.3d 684, 687 (4th Cir. 2006) ("The sole concern of section 3553(a)(6) is with sentencing disparities among federal defendants.") (emphasis omitted). One of the purposes of the Sentencing Commission, and by extension the Sentencing Guidelines, is to "establish sentencing policies and practices for the Federal criminal justice system that . . . provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct . . . ." 28 U.S.C. § 991(b)(1)(B) (emphasis added); see also Clark, 434 F.3d at 687 ("The Guidelines sought to avoid only the unwarranted disparities that existed in the federal criminal justice system, that system for which the Guidelines are governing law.").

To require parity in sentencing between state and federal defendants "would seriously undermine the goal of nationwide uniformity in the sentencing of similar defendants for similar federal offenses." See Willis, 139 F.3d at 812. Before the Supreme Court decided Booker, we held, in Willis, that a district court could not grant a downward departure from the guidelines "[b]ased on the disparity in sentences imposed on brothers of roughly equal culpability for the same offense conduct" when one of the brothers was prosecuted in state court, pleaded guilty based on an agreement with the government, and received a sentence of time served and probation. Id. "[T]he district court may not depart downward in order to reconcile disparity between federal and state sentences among codefendants because such departures create systemwide disparities among federal sentences." Id. We concluded, "The guidelines do not comment on disparate federal and state sentences imposed upon codefendants . . . ." Id.

After Booker, the Seventh Circuit rejected a similar argument to vary from the guidelines range and shorten the sentence of a federal defendant based on the sentence received by another conspirator in state court because that variance would have created disparities within the federal system:

> Reducing a federal prisoner's sentence to accord with that of a similarly situated state convict may decrease one sentencing disparity but simultaneously enlarges another: that between the federal convict and all similarly situated federal convicts. Because penalties vary

25

from state to state, sentence reductions to approach state penalties similarly vary with the state in which the federal sentencing court sits, unjustifiably creating disparities among federal convicts.

United States v. Wurzinger, 467 F.3d 649, 654 (7th Cir. 2006) (citation omitted).

Section 3553(a)(6) addresses unwarranted sentence disparities among federal defendants who are similarly situated instead of disparate federal and state sentences. Docampo was not entitled to a less severe sentence based on the sentences received by Powell and Luengas in state court. Docampo, a federal defendant who was found guilty following a jury trial, is not similarly situated, under section 3553(a)(6), to Powell and Luengas, who were prosecuted in state court and pleaded guilty. See id; Clark, 434 F.3d at 687; see also Williams, 526 F.3d at 1323–24.

The dissent faults us for "focus[ing] on only one § 3553(a) factor in reaching [the] conclusion that the sentence [i]s substantively reasonable," but Docampo does not argue that his sentence is substantively unreasonable based on the other factors. "[T]he party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both that record and the factors in section 3553(a)." Talley, 431 F.3d at 788. Docampo argues that his sentence is unreasonable based on sentencing disparity, but he does not argue, much less establish, that his sentence is unreasonable based on any other factor. We decline

26

to assume the role of counsel and make a new argument for Docampo. Because Docampo has not established that his sentence "fails to achieve the purposes of sentencing as stated in section 3553(a)," id., we conclude that his sentence is reasonable.

## IV. CONCLUSION

Docampo's convictions and sentences are **AFFIRMED.**

**BARKETT, Circuit Judge, concurring, in part, and dissenting, in part:**

I concur in the majority opinion but for its determination that John Docampo's sentence of 22.5 years is reasonable. I believe a sentencing court's passing mention that it has considered the 28 U.S.C. § 3553(a) factors without more analysis, as in this case, provides an insufficient basis for appellate review and consequently is procedurally unreasonable. I further believe, under the facts presented, that Docampo's sentence is substantively unreasonable, a conclusion only bolstered by the far lower sentences imposed on all of his significantly more culpable co-conspirators.

## I. BACKGROUND

At the time of his arrest, Docampo had just turned eighteen and had no prior criminal record. His crime stemmed from a fictional robbery opportunity presented by an undercover agent to Israil Reyes, who brought in two associates, Luis Alex Gutierrez and Sebastian Luengas. Those three men met with the undercover agent and conducted extensive planning before Docampo was ever involved. Only days before the planned robbery, Luengas met with Edwardo Lorenzo and Docampo and asked if they wished to participate. Although Lorenzo declined to participate in the robbery, he agreed to give a gun to Docampo, who wanted to take part. It is unclear whether, at that point, Docampo planned to use

28

this firearm for the robbery. On the day of the robbery, Christian Carmona and David Powell, two other defendants who had also joined the group after the initial planning, met with Docampo and Gutierrez at Luengas's residence. They decided that they needed another firearm, so they went to retrieve the gun that Docampo had received from Lorenzo and gave it to Reyes.

Luengas and Powell—both seventeen-year-old juveniles—were charged in state court as adults, pled guilty, and received only probation.[1] Reyes, Gutierrez, and Docampo were charged in federal court with counts of conspiracy to possess cocaine and possession of a firearm in furtherance of the conspiracy. Reyes and Gutierrez, who had actually planned the robbery, both pled guilty and agreed to testify against Docampo. Reyes ultimately received a 180-month sentence.[2] Gutierrez received the statutory mandatory minimum of 60 months for the firearms charge and no additional time for the conspiracy. Docampo, who was pressured by his father to reject any plea deal, went to trial and was subsequently convicted of both charges. At sentencing, a psychiatrist described Docampo as someone who

---

[1] Carmona was also seventeen years old but was killed in an unrelated crime before further criminal proceedings could take place.

[2] Reyes initially received a sentence of 168 months for the conspiracy count and the statutory minimum of 60 months for the firearms count. He then received a four-level reduction for his testimony against Docampo, bringing down his sentence to approximately 180 months—in essence, 120 months for the conspiracy and the mandatory 60 months for the firearm.

"functioned at the level of a 16-17 year old," and testified that he completely submitted to his father's instructions that he not enter a plea. The judge sentenced Docampo to 270 months—60 months for the firearms charge and 210 months for the conspiracy—because "we've got to stop [the continuing rise of gang violence]. The community expects it to stop." Thus, Docampo's conspiracy sentence, after going to trial, was seventy-five percent greater than that of Reyes, who was the ringleader of the robbery.[3] None of the other co-conspirators received any time for the conspiracy charge.

## II. DISCUSSION

Pursuant to United States v. Booker, appellate courts must review criminal sentencing for "unreasonableness." 543 U.S. 220, 261 (2005); see also Rita v. United States, 551 U.S. 338 (2007); Kimbrough v. United States, 128 S. Ct. 558 (2007); Gall v. United States, 128 S. Ct. 586 (2007).[4] What is reasonable falls within the discretionary purview given to the sentencing judge. However, review under an abuse of discretion standard is not simply a rubber stamp. See Gall, 128 S. Ct. at 607 (Alito, J., dissenting) ("Appellate review for abuse of discretion is not an empty formality. A decision calling for the exercise of judicial discretion

_____

[3] That is, Docampo received 210 months for the conspiracy while Reyes received 120 months. See supra n.2.

[4] I will refer to this set of cases collectively as "the Supreme Court sentencing cases."

30

'hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review.'") (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 416 (1975)); see also United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008) ("[It] remains true that the district court's choice of sentence is not unfettered.").

Our two-stage review ensures that district courts impose a sentence that is both procedurally reasonable and substantively reasonable in light of the § 3553(a) factors. Gall, 128 S. Ct. at 600. The abuse of discretion standard "applies to appellate review of all sentencing decisions—whether inside or outside the [Sentencing] Guidelines range." Id. at 596. While we acknowledge that there is a "range of reasonable sentences from which the district court may choose," United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005), no appellate court can presume that a sentence outside the Guidelines range is unreasonable, Rita, 551 U.S. at 355, nor does this court apply a "presumption of reasonableness" for sentences that fall within the Guidelines, Talley, 431 F.3d at 787–88 ("[W]e reject the argument of the United States that a sentence within the Guidelines range is per se reasonable . . . . After Booker, our ordinary expectation [that a within-Guidelines sentence is reasonable] still has to be measured against the record . . . .").

31

The Supreme Court sentencing cases have incontrovertibly established that a reasonableness inquiry must be heavily grounded in the specific facts of the case at hand—not simply the broad criminal statute under which the defendant was charged. The sentence must be properly individualized to the defendant, both procedurally and substantively. In this case, for the reasons expressed below, the sentence imposed on Docampo was neither procedurally nor substantively reasonable.

*A. Procedural Reasonableness*

The procedural sentencing requirements are straightforward—the district court is required to (1) not base a sentence on clearly erroneous facts; (2) properly calculate the Guideline imprisonment range; (3) treat the Guidelines as advisory rather than mandatory; (4) consider all of the § 3553(a) factors; and (5) adequately explain its reasoning. Gall, 128 S. Ct. at 596. However, application of these requirements, particularly the last three, can be complex.

First, the Supreme Court, in holding that the Guidelines are "advisory," has made clear that a "district court[] must treat the Guidelines as the starting point and the initial benchmark," Kimbrough, 128 S. Ct. at 574 (quotation omitted), it must give them "respectful consideration," id. at 570, and it must "take them into account," Booker, 543 U.S. at 264. However, the Supreme Court has also declared

that the Guidelines "now serve as <u>one factor among several</u> courts must consider in determining an appropriate sentence," <u>Kimbrough</u>, 128 S. Ct. at 564 (emphasis added), and a district court may "tailor the sentence in light of other statutory concerns," <u>id.</u> at 570 (quotation omitted).  Furthermore, a sentencing court "may <u>not</u> presume that the Guidelines range is reasonable."  <u>Gall</u>, 128 S. Ct. at 596–97 (emphasis added); <u>see also</u> <u>Nelson v. United States</u>, 129 S. Ct. 890, 892 (2009) ("The guidelines are not only <u>not mandatory</u> on sentencing courts; they are also not to be <u>presumed</u> reasonable.").

There is, of course, a wide range between a "starting point warranting respectful consideration" and "no presumption of reasonableness."  Some of the Supreme Court Justices have expressed serious concern about how to apply the Guidelines given the latent ambiguity in their advisory nature: "[I]f sentencing judges attributed substantial gravitational pull to the now-discretionary Guidelines, if they treated the Guidelines result as persuasive or presumptively appropriate, the <u>Booker</u> remedy would in practical terms preserve the very feature of the Guidelines that threatened to trivialize the jury right."  <u>Rita</u>, 551 U.S. at 390 (Souter, J., dissenting); <u>see also</u> <u>id.</u> at 366 (Stevens, J., concurring) ("I am not blind to the fact that, as a practical matter, many federal judges continued to treat the Guidelines as

33

virtually mandatory after our decision in <u>Booker</u>.").[5]

To vindicate the right established in <u>Booker</u> that the Guidelines cannot be <u>de jure</u> mandatory, meaningful appellate sentencing review must assure that district courts are not simply treating them as <u>de facto</u> mandatory. The recognition of any right must be paired with a mechanism by which that right can be both interpreted and enforced. Thus, it is the responsibility of appellate courts to ensure that sentencing judges make a concerted effort to reach <u>independent conclusions</u> about the appropriateness of a sentence in each specific case. We can only do so by ascertaining if the Guidelines served as just one of the factors that contributed to the determination of the sentence and not its sole basis. This in turn requires a close examination of the district court's reasoning for imposing a given sentence—another procedural reasonableness requirement.

Congress requires the district court to "state in open court the reasons for its imposition of the particular sentence," § 3553(c), and before doing so, the court

---

[5] Not only have district courts now become used to relying on them, but the Guidelines inevitably have a considerable anchoring effect on a district court's analysis:

> Anchoring is a strategy used to simplify complex tasks, in which numeric judgments are assimilated to a previously considered standard. When asked to make a judgment, decision-makers take an initial starting value (i.e., the anchor) and then adjust it up or down. Studies underscore the significance of that initial anchor; judgments tend to be strongly biased in its direction.

Nancy Gertner, <u>What Yogi Berra Teaches About Post-Booker Sentencing</u>, 115 Yale L.J. Pocket Part 127 (2006), http://www.thepocketpart.org/2006/07/gertner.html (quotations omitted).

must consider each of the factors delineated in § 3553(a) to arrive at the appropriate sentence.[6] It is not easy, however, to strike the proper balance between requiring that a judge offer a "sufficient explanation" for the sentence and overburdening a judge by demanding an in-depth discussion of every sentencing decision. The Supreme Court has directly acknowledged this difficult task, noting that "a public statement" of a judge's reasons provides "the public with the assurance that creates [] trust [in the judicial institution]" but that it does not "read the [§ 3553] statute (or our precedent) as insisting upon a full opinion in every case." Rita, 551 U.S. at 356. The Court instead offered the following guidance: "The sentencing judge should set forth enough to satisfy the appellate court that he

_____

[6] Section 3553(a) provides:

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
      (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
      (2) the need for the sentence imposed--
            (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
            (B) to afford adequate deterrence to criminal conduct;
            (C) to protect the public from further crimes of the defendant; and
            (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
      (3) the kinds of sentences available;
      (4) [the Sentencing Guidelines range]
      (5) any pertinent policy statement [issued by the Sentencing Commission]
      (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
      (7) the need to provide restitution to any victims of the offense.

35

has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority," id. (emphasis added), and "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing," Gall, 128 S. Ct. at 597 (emphasis added).

What is "enough" or "adequate" depends upon the circumstances of the particular case at hand:

> Circumstances may well make clear that the judge rests his decision upon the Commission's own reasoning that the Guidelines sentence is a proper sentence (in terms of § 3553(a) and other congressional mandates) in the typical case, and that the judge has found that the case before him is typical. Unless a party contests the Guidelines sentence generally under § 3553(a)—that is argues that the Guidelines reflect an unsound judgment, or, for example, that they do not generally treat certain defendant characteristics in the proper way—or argues for departure, the judge normally need say no more.

Rita, 551 U.S. at 357 (emphasis added); see also id. at 359 (finding that if the case is "simple," and "the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively"). Thus, less may be required if a case is "simple" or "typical." The logical corollary of this conclusion, however, is that more is required when a judge is faced with an atypical case or the defendant argues that a departure from the Guidelines is warranted.

36

The courts of appeals have struggled with the depth of explanation required. The Tenth Circuit and a panel decision in the Seventh Circuit have held that conclusory sentencing opinions are sufficient.  See United States v. Cereceres-Zavala, 499 F.3d 1211, 1217 (10th Cir. 2007) (requiring only "a general statement of the reasons for its imposition of the particular sentence" as opposed to a "specific explanation") (quotations omitted); United States v. Gammicchia, 498 F.3d 467, 468–69 (7th Cir. 2007) (finding the § 3553(a) factors "vague and nondirectional" and not requiring any mention of the factors so long as the judge "said" he considered them).  On the other hand, the First and Sixth Circuits, and another panel of the Seventh Circuit, have required a specific discussion of the § 3553(a) factors, at least in certain circumstances.  See United States v. Cirilo-Munoz, 504 F.3d 106 (1st Cir. 2007) (remanding the case because of the inadequacy of the sentencing explanation); id. at 118 (Torruella, J., concurring) (stating that the district court's analysis and reasons must be "tested against the record of the case to determine whether the reasoning is supported by the record, and [to determine] ultimately, whether the sentence is reasonable"); United States v. Thomas, 498 F.3d 336, 339–40 (6th Cir. 2007) (concluding that the proper review requires the appellate court to examine the sentencing transcript to determine whether the sentencing court adequately considered the relevant §

37

3553(a) factors and clearly stated its reasons for imposing the chosen sentence);

United States v. Miranda, 505 F.3d 785, 792, 796 (7th Cir. 2007) (noting that

"when a court gives little or no attention to the defendant's principal argument . . .

we cannot have confidence that the judge adequately considered the section

3553(a) factors" . . . [and therefore is] likely to have committed an error or

oversight" and further stating that "a rote statement that the judge considered all of

the relevant factors will not always suffice") (quotations omitted).

Our own circuit in United States v. Scott has held that "nothing in Booker or

elsewhere requires the district court to state on the record that it has explicitly

considered each of the § 3553(a) factors or to discuss each of the § 3553(a)

factors." 426 F.3d 1324, 1329 (11th Cir. 2005) (emphasis added).  We have

subsequently held in Talley, that an "acknowledgment by the district court that it

has considered the defendant's arguments and the factors in section 3553(a) is

sufficient under Booker."  431 F.3d at 786.

Based on the language of the Supreme Court sentencing cases, I believe that,

for atypical or non-simple cases, it is not enough for a district court to simply state

that it has "considered the § 3553(a) factors."  Our previous holdings do not free

the district court from the requirement that it adequately explain its reasoning nor

free us from our obligation to ensure that all the § 3553(a) factors were truly

38

considered.  See Rita, 551 U.S. at 366 (Stevens, J., concurring) ("Booker's

standard of review . . . requires [] district judges to consider all of the factors listed

in § 3553(a) and to apply them to the individual defendants before them.").  Thus,

while a mechanical discussion of each § 3553(a) factor may not be necessary in

every case, a district court has a responsibility to analyze the relevant factors on the

record.  These would include a particular § 3553(a) factor raised by a defendant, or

one clearly implicated by the specific facts of that case.  To the extent that our

circuit's cases are interpreted to hold otherwise, I believe such an interpretation is

erroneous as applied to non-typical cases.[7]

Due process requires a rational basis for judicial decisions—especially when

ordering the incarceration of a defendant.  We cannot legitimately be deferential to

a sentencing determination until we first understand its foundation.  It bears

emphasizing that requiring a sufficiently detailed record does not undermine the

---

[7] Moreover, the sentencing judge should be able to articulate the rationale that justifies the actual number of months or years that make up a defendant's sentence, whether that number is within or outside the Sentencing Guidelines.  A reasonable sentence is one for which there is an explanation of how the particular length of the imposed sentence corresponds to the individual sentencing needs of the particular defendant.  For example, how does a sentence of fifteen years, as opposed to a sentence of five or ten years, or twenty-two years for that matter, serve the needs of individual and general deterrence while also addressing the nature of the crime and the individual characteristics of the defendant in a given case?  The number of years cannot be determined simply by an individual judge's gut feeling.  As a society that values due process, we must have some rationalization for every step of our judicial system.  There should be a transparent, logical, and reasonable justification to support the amount of jail time prescribed for a particular defendant based on the § 3553 factors.

sentencing court's ultimate discretion. I do not in any way suggest that an appellate court substitute its own view of the appropriate sentence for that of the district judge, who is better able to assess the credibility of sentencing witnesses, including the sincerity of a defendant's remorse or the potential for rehabilitation. I simply observe that an appellate court must be able to thoroughly understand the basis for the sentencing court's decision in order to properly review it.

Applying the Congressional dictates here, Docampo's sentence is procedurally unreasonable because the district court did not appear to have considered the § 3553(a) factors on an individualized basis, nor did it adequately explain its decision. This is anything but a typical or simple case. We are considering a fictional robbery where Docampo, who had just turned eighteen, was the only person to go to trial, was not the subject of the sting but rather only a peripheral player in the conspiracy, and yet was sentenced to a drastically longer sentence than every other co-conspirator. The sentencing record reveals little explication, aside from the court's statement that it had "consider[ed] the advisory sentencing guidelines and all of the [§ 3553(a)] factors." The judge's only comments centered on Docampo's voluntary participation in the crime, the potential violence that might have resulted had the firearms been used, and the general rise of gang violence—after which the judge opined, "[W]e've got to stop

it.  The community expects it to stop."  There was no evidence, however, tying Docampo to any  conduct other than that for which he was convicted—joining the conspiracy at the last minute and transferring a gun from one person to the ringleader.  More importantly, the judge made no mention at sentencing of the "nature and circumstances" of the <u>actual</u> crime that <u>did</u> occur or Docampo's "history and characteristics"—such as the absence of a criminal record or his biological or psychological age.[8]  Without more on the record, it is hard to say whether the judge presumed that the Guidelines range was reasonable or considered <u>any</u> of the § 3553(a) factors save one—the abstract principle of "general deterrence."

When a court has given little indication it has taken into account the pertinent facts specific to the case, it constitutes an abuse of discretion:

> [T]he district court must give some weight to the factors in a manner that is at least loosely commensurate with their importance to the case, and in a way that achieves the purposes of sentencing stated in § 3553(a).  Where it does not, and instead commits a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case, we must remand for resentencing.  Indeed, if we could not say so here, we would come perilously close to holding that appellate

---

[8] The judge's only discussion of any details particular to Docampo occurred before her sentencing decision in a response to his lawyer's assertion that Docampo had an impressive job history for a teenager.  The judge questioned whether Docampo's job history was as positive as his lawyer suggested, pointing to the fact that Docampo had been dismissed for poor performance by one employer and had quit some jobs.

> review is limited to procedural irregularity, so long as the district court says it has reviewed all of the Section 3553(a) factors. We do not read Supreme Court precedent as having so eviscerated appellate review at the same time that it has mandated the appellate courts to continue to review sentences for reasonableness.

Pugh, 515 F.3d at 1203–04 (quotations omitted). While Pugh dealt with whether it was unreasonable for the district court to have deviated below the Guidelines, its conclusion is no less true in cases where the district court sentenced within the Guidelines but the facts may dictate that a reasonable sentence should, in fact, be below the Guidelines.

Because the sentencing judge here did not adequately grapple with the pertinent § 3553(a) factors to fashion an individualized sentence, I would vacate and remand Docampo's sentence for reconsideration.

### B. Substantive Reasonableness

Our substantive review asks whether the specific sentence imposed is reasonable and supported by the § 3553(a) factors. Gall, 128 S. Ct. at 600. Black's Law Dictionary defines "reasonable" as "[f]air, proper, or moderate under the circumstances." The Oxford English Dictionary defines it as "proportionate" or "of such an amount, size, number, etc., as is judged to be appropriate or suitable to the circumstances or purpose." The common theme is that reasonableness is circumstance-dependent; in other words, it must be determined in the context of

42

each specific case. For this reason the Supreme Court has said that "[w]hen conducting this [sentencing] review, the court will, of course take into account the totality of the circumstances." Gall, 128 S. Ct. at 597.

The overarching aim of sentencing is to achieve proportionality—that is, we are attempting to impose a punishment that, as the statute expressly mandates, is "sufficient, but not greater than necessary, to comply with the purposes [of criminal sentencing]." § 3553(a) (emphasis added). Consideration of the § 3553(a) factors was required by Congress to achieve this proportionality.

The very first factor that Congress instructs judges to consider emphasizes the individual element of the inquiry: "the nature and circumstances of the offense and the history and characteristics of the defendant." Id. The statute then sets out multiple purposes to weigh when ascertaining the appropriate length of a sentence:

> [T]o reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Id. While two of the purposes are broad and abstract—"promote respect for the law" and "afford adequate deterrence to criminal conduct"—the other four focus on the specific offense and the specific defendant. Furthermore, the Supreme Court has noted that the Sentencing Guidelines themselves have the fundamental

43

goal of "avoid[ing] excessive sentencing disparities <u>while maintaining flexibility sufficient to individualize sentences where necessary</u>."  <u>Booker</u>, 543 U.S. at 265 (emphasis added).

To preserve the flexibility to individualize and avoid sentencing in the abstract, an intensive fact-based inquiry is necessary to determine if a sentence is indeed reasonable.  Accordingly, a sentence is substantively unreasonable if the individualized facts of the case are not properly taken into account, and a judge simply focuses on § 3553(a)'s generally-applicable principles.  <u>See, e.g.</u>, <u>Gall</u>, 128 S. Ct. at 607 (Alito, J., dissenting) ("[W]hen a trial court is required by statute to take specified factors into account in making a discretionary decision, the trial court must be reversed if it 'ignored or slighted a factor that Congress has deemed pertinent.'") (quoting <u>United States v. Taylor</u>, 487 U.S. 326, 337 (1988)).  A reviewing court reads out of § 3553(a) every "individualization" factor if it always deems a sentence reasonable when a district judge has grounded the decision solely in the abstract principles of "deterrence" and a need to "promote respect for the law."

When we ask if the district court has imposed a sentence "sufficient, but not greater than necessary," we essentially pose two separate questions:  (1) Is the sentence <u>enough</u> punishment? and (2) Is the sentence <u>too much</u> punishment?

Appellate courts have had no difficulty finding unreasonableness when asking the former. See, e.g., Pugh, 515 F.3d at 1179 (finding that probation for a possessor of some child pornography was insufficient). We should likewise be willing to find that, in a case that warrants it, "a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing," Kimbrough, 128 S. Ct. at 564 (quoting § 3553(a)). Our appellate sentencing review should not develop into a one-way rachet upwards.[9] Just as the district court has an obligation not to assume the Guidelines are automatically reasonable, we too—as a circuit that does not apply a reasonableness presumption—are obligated to ask whether a within-Guidelines sentence is reasonable without any thumb on the scale. Thus, reiterating what we have previously noted, there are "many instances where the Guidelines range will not yield a reasonable sentence. . . . In some cases it may be appropriate to defer to the Guidelines; in others, not." United States v. Hunt, 459 F.3d 1180, 1184 (11th Cir. 2006).

---

[9] We must not lose sight of the fact that sentence uniformity is a two-sided coin. It does not simply mean ensuring that similarly situated defendants are sentenced similarly. It also entails "[the] need to avoid unwarranted similarities among other co-conspirators who were not similarly situated." Gall, 128 S. Ct. at 600 (emphasis added). That is, we must avoid a "false uniformity." See United States v. Cabrera, 567 F. Supp. 2d 271, 273 (D. Mass. 2008) ("False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration . . . to mask other important factors."). Even when a charged crime is the same, the manner in which it was committed, the degree of culpability, and the background of the defendant are often very different. In other words, sometimes deviations from the Guidelines—and not its mechanical application— are actually needed to achieve true sentencing uniformity.

There is no doubt in my mind that Docampo's sentence is far "greater than necessary" to comply with the sentencing goals. A psychiatrist testified that he was functioning as a sixteen or seventeen year old and was completely submissive to his father. He had no criminal history.[10] He will now be incarcerated until he is over forty years old. Had he been only two months younger at the time of the fictitious robbery, he would have been tried in state court along with the other juveniles who received probation.[11] The district court gave no weight to any of the factors that bore on this particular defendant and this particular attempted crime.

_____

[10] I do not find that Docampo's bravado boasting to his co-conspirators that he was "experienced" in robberies undercuts the fact that he has no criminal record. His boasts may have had no basis in fact. Regardless, no evidence of any prior criminal "experience" was proven by the State, at sentencing or otherwise.

[11] While the law requires that Docampo be tried as an adult the moment he turned 18—to be treated no differently than older adults during the prosecution stage—, Docampo's age is still relevant in considering the "totality of the circumstances" for sentencing purposes. As the Supreme Court has noted in the death penalty context, "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Roper v. Simmons, 543 U.S. 551, 574 (2005).
   There is no doubt that, for the sake of efficient administrability, our judicial system must draw a categorical line somewhere to differentiate between "juveniles" and "adults." But that legal necessity does not change the psychological and sociological facts found in Roper: (1) that "juveniles will be less susceptible to deterrence" because there is a "[remote] likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to [serious punishment]"; (2) that "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young . . . often result[ing] in impetuous and ill-considered actions and decisions"; (3) that "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and (4) "that the character of a juvenile is not as well formed as that of an adult." Id. at 561, 569–72 (emphasis added) (quotations omitted). Nor does that necessity preclude us from considering the relevance of these facts as they pertain to consideration of § 3553(a)(1)'s "characteristics of the defendant." On the contrary, we are obligated to do so.

46

Indeed, there is a total absence of case-specific analysis or consideration of the "totality of the circumstances." Rather, the judge based the justification of the sentence solely on the abstract principle of deterrence and the need to "make an example" out of Docampo—considerations which are at odds with the individualized sentencing required by the Sentencing Guidelines and <u>Booker</u>.

I would also note that the majority opinion itself focuses on only one § 3553(a) factor in reaching its conclusion that the sentence was substantively reasonable—whether Docampo was "similarly situated" to his co-conspirators per § 3553(a)(6). The majority's analysis is limited to why Docampo is <u>not</u> similarly situated, forgoing any discussion of the other "individualization" factors that counsel against upholding such an extreme sentence.[12] This emphasis is

---

[12] The majority states that Docampo does not argue that his sentence is substantively unreasonable based on any other factor. This is incorrect. Docampo explicitly argues that the "record does not reflect that the court considered . . . 'the nature and circumstances of the offense,' § 3553(a)(1); the 'history and characteristics of the defendant,' § 3553(a)(1); . . . and whether the sentence imposed was 'sufficient but not greater than necessary, to comply with' this and other purposes of sentencing, § 3553(a)." [Bl. Br. 42]. He then cites to specific details that he asserts render the sentence unreasonable:

> Docampo's lack of serious prior criminal record, his strong community and family support, his young age, his emotional immaturity, the sentences of the codefendants, the fact that the "crime" was a fictionalized sting, and that there was no victim, as well as the role his father played in aborting his cooperation proffer and insisting that he take the case to trial (another example, according to Dr. Maher, of Docampo's emotional immaturity, that in a childlike fashion he allowed his father to dictate the course of his defense), and similar factors.

[Bl. Br. 43].

47

inconsistent with the holistic approach mandated under our substantive review.

Moreover, as to the specific "similarly situated" factor, the majority opinion appears to creates a false dichotomy. The fact that there is no uniformity requirement does not then give a sentencing court carte blanche to impose radically disproportionate sentences. While our case law may not treat the defendants who agreed to cooperate with the government or those who were tried in state court as "similarly situated" to Docampo such that they should have been given <u>uniform</u> sentences, the <u>extreme disparity</u> that has occurred here cannot help but bolster the conclusion that Docampo's punishment was excessive. The fact that Docampo's co-conspirators received radically lower sentences undermines the argument that a sentence of twenty-two years and six months was <u>required</u> in order to be "sufficient" but was not "greater than necessary." Thus, the disparities in their sentences must still play some role in our assessment of the "totality of the circumstances." Indeed, it is hard to escape the view that Docampo, in essence, is being punished for exercising his right to a jury trial. <u>See, e.g.</u>, <u>Blackmon v. Wainwright</u>, 608 F.2d 183, 184 (5th Cir. 1979) ("[A] defendant cannot be punished by a more severe sentence because he unsuccessfully exercised his constitutional right to stand trial rather than plead guilty.") (quotation omitted).[13]

_____

[13] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to

Because I do not believe Docampo received an individualized, or

proportional, or reasonable sentence, I respectfully dissent.



close of business on September 30, 1981.