[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 20, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12526
Non-Argument Calendar

_____

D. C. Docket No. 06-00313-CR-3-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOYA WILLIAMS,

Defendant-Appellant.

_____

No. 07-12653
Non-Argument Calendar

_____

D. C. Docket No. 06-00313-CR-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

IBRAHIM DIMSON,
a.k.a. Dirk,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(March 20, 2008)**

Before CARNES, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

In these consolidated appeals, Joya Williams appeals her conviction and 96-month sentence, and Ibrahim Dimson appeals his 60-month sentence, for conspiracy to commit theft of trade secrets, in violation of 18 U.S.C. § 1832(a)(1), (3), and (5).

**I.**

Williams, who was employed by the Coca-Cola Company as an executive assistant to a high level Coca-Cola employee, approached co-defendant Edmund Duhaney in November 2005 at a family Thanksgiving dinner and told him that they needed to discuss a private matter. Afterward, Williams began calling and sending text messages to Duhaney about the matter. In late December 2005,

2

Duhaney met with Williams at her apartment in Norcross, Georgia. Williams told Duhaney that she had copies of confidential Coca-Cola documents that were worth money to some competitors.

Specifically, Williams told Duhaney that she had memory sticks containing information, and she showed him confidential Coca-Cola marketing documents and a product sample. Although Williams was angry with Coca-Cola because she felt she was not "treated right," she told Duhaney that she had signed a nondisclosure confidentiality agreement with Coca-Cola and was therefore unable to do anything with the confidential materials. She wanted Duhaney to determine if someone could use the confidential information to obtain money from another company.

About one week later, Williams contacted Duhaney to ask about his progress with the Coca-Cola documents. Afterward, Williams made several more telephone calls and text messages to Duhaney to check on his progress. In February 2005, Duhaney contacted a friend of his, Dimson, who was interested in the documents because he realized they were worth money. Dimson agreed to travel to Georgia to review the documents. On April 4, 2006, Duhaney picked Dimson up from the airport in Atlanta and brought him to Williams' apartment.

While Williams explained the documents to Dimson, Duhaney listened and

3

then began thumbing through a magazine. During the meeting, Williams stated that this happens all the time in corporate America and Pepsi would be interested in this type of information. Dimson and Duhaney then decided to travel to a nearby Wal-Mart store to purchase a black roller bag and plastic folders for the documents.

Two or three days later, Williams called Duhaney on his cell phone and inquired about Dimson's progress with the documents. Two weeks later, Duhaney contacted Dimson, who told Duhaney that he was working on the materials. Dimson asked for Coca-Cola envelopes and told Duhaney to call Williams to update her on the progress. Duhaney later spoke to Williams and told her that Dimson needed an envelope to contact Pepsi. Williams replied that it wouldn't be a problem. Duhaney also asked Williams if she knew anyone at Pepsi, and Williams said she had an idea and could find out.

On May 8, 2006, Dimson wrote a letter to Pepsi, which was addressed to "Antonio J. Lucio SVP of Insights and Innovation" in Purchase, New York and was sent in an official Coca-Cola business envelope. In it, Dimson claimed to be a high-level employee for Coca-Cola, used the name "Dirk," and provided a contact phone number that was later shown to be his cell phone number. The letter stated that Dimson had "very detailed and confidential information about Coca-Cola's

4

marketing campaigns for the next 4 years" that he was "looking to deliver . . . to the highest bidder." It further provided that the "exclusive offer" to Pepsi was only available for two weeks, and that Dimson was willing to provide proof of the information.

On May 19, 2006, Pepsi personnel faxed a copy of the letter to Coca-Cola. On May 24, 2006, Coca-Cola security personnel met with agents from the FBI, who were provided the faxed copy of the letter and later the original. Coca-Cola explained to the agents that the information in the letter was considered highly confidential, and at that point, the FBI initiated an undercover investigation. Special Agent Gerald Reichard was assigned to pose as an agent for Pepsi interested in purchasing the information.

On May 25, 2006, Agent Reichard, acting undercover and using the name "Jerry," contacted Dimson at the phone number listed in the letter. Dimson identified himself as "Dirk" and confirmed that he had sent the letter to Pepsi. Dimson told Reichard that he possessed Coca-Cola documents and had almost unlimited ongoing access to more confidential information.

On May 26, 2006, Agent Reichard received from Dimson 14 faxed pages of Coca-Cola documents that contained the company's logo and were marked "confidential information" or "classified-highly restricted." That same day,

5

Williams sent a 65 pound package through Federal Express to Dimson in New York. She listed Duhaney as the sender. When Williams was eventually arrested and her apartment was searched, the Federal Express receipt was recovered.

On May 30, 2006, Agent Reichard had several telephone conversations with Dimson. During these conversations, Dimson told Reichard about certain Coca-Cola documents he possessed. He requested that Reichard pay him $10,000 as "good faith money" for the documents and as proof that he was willing to purchase more information. Dimson provided an email address to Reichard, as well as his Bank of America account number where Reichard was to deposit the money.

On June 2, 2006, Agent Reichard sent an email message to Dimson, telling him that there was "quite a bit of interest" in Dimson's information. Dimson responded that he could provide some of the information by fax, and he also told Reichard about several other documents he possessed. He expressed frustration that Reichard was moving slowly, and stated that he wanted him to wire $9,000 into his Bank of America account quickly to show that he was serious. Dimson also called Reichard to relate some of the same information. Later that day, Reichard received a one-page fax that contained an example of the documents Dimson possessed.

On June 6, 2006, Dimson called Agent Reichard and offered additional

Coca-Cola documents, as well as an actual product sample. Dimson sent Reichard two faxes with examples of the new documents. On June 7, 2006, Coca-Cola security installed two cameras to observe Williams' work area. Dimson and Reichard continued their negotiations.

On June 12, 2006, Coca-Cola security installed additional cameras near Williams' work area. Footage from the cameras showed Williams at her desk going through multiple files looking for documents. After locating them, Williams placed the papers into her personal bag. In some cases, Williams stuffed papers into a plastic bag before placing them in her bag. Williams was also observed holding a new Coca-Cola product sample before placing it into her personal bag.

On June 15, 2006, Agent Reichard notified Dimson that he had the funds Dimson had requested and wanted to talk to him. The two agreed to meet at Atlanta Hartsfield-Jackson International airport the next day. On June 16, a warrant was obtained to wiretap Dimson's cell phone. The FBI then recorded conversations between Dimson and Duhaney, as well as voice mail messages between Dimson and Williams. Also on that day, Agent Reichard met with Dimson at the Hartsfield-Jackson airport as they had planned. Dimson provided Reichard with Coca-Cola documents marked highly confidential, as well as a glass bottle containing a liquid product sample. Reichard paid Dimson $30,000 up front,

and agreed to pay him an additional $45,000 after successful product testing. Duhaney picked Dimson up from the airport, and the two traveled together to Duhaney's home in Decatur, Georgia.

Dimson gave Duhaney an envelope with $8,000 in it and asked him to give it to Williams. Duhaney kept $2,000 for himself, and the next day gave Williams the remaining $6,000 in cash. Williams deposited $4,000 in cash into her bank account that same day. Video surveillance footage at Coca-Cola revealed that Williams continued to take Coca-Cola documents and product samples, and Dimson kept contacting Agent Reichard with new information he had to offer. Coca-Cola personnel verified that the materials Reichard had received from Dimson were valid trade secrets and were confidential.

On June 22, 2006, Dimson emailed Agent Reichard a list of 20 items in his possession, and during conversations over the next several days, they negotiated a purchase price of $1.5 million for all the items. They agreed to meet on Wednesday, July 5, 2006, to complete the sale. In order to ensure his presence at their meeting, Dimson requested that Reichard wire a total of $11,000 into his bank account. Dimson also called Duhaney to discuss the breakdown of the money, and they agreed to give Williams, who they referred to as "Joya," $100,000 to $150,000, with $50,000 up front.

On June 29, 2006, the FBI wired $10,000 into Dimson's bank account. Dimson called Agent Reichard to let him know he had received the transfer. The two met at the restaurant in a Marriott hotel in Atlanta on July 5, 2006. Duhaney drove Dimson to the hotel and remained in his car during the meeting. At the meeting, Reichard agreed to purchase the additional documents and product samples from Dimson for $1.5 million. After the meeting, the FBI arrested Dimson and Duhaney. Williams was arrested later.

Following their arrests, a federal grand jury indicted Williams, Dimson, and Duhaney for conspiracy to commit theft of trade secrets, in violation of 18 U.S.C. § 1832(a)(1), (3), and (5). Dimson pleaded guilty to the charge without a plea agreement, and Williams pleaded not guilty and proceeded to a jury trial. Duhaney later pleaded guilty pursuant to a written plea agreement and agreed to testify against Williams.

After a lengthy trial where Williams testified on her own behalf, the jury convicted her of the conspiracy charge. She and Dimson were sentenced at the same sentence hearing. The district court varied above the guidelines for both of them, sentencing Williams to 96 months imprisonment and Dimson to 60 months imprisonment. Williams and Dimson timely appealed.

**II.**

Williams first contends that the district court violated her Sixth Amendment rights by limiting her cross-examination of Duhaney regarding notes found in his car that he took from the book The 48 Laws of Power. According to Williams, the evidence was crucial to her case because it showed why Duhaney would portray Williams as a knowing participant in the conspiracy when, according to her, she was not.

Generally, we review a district court's evidentiary rulings only for an abuse of discretion. United States v. Taylor, 17 F.3d 333, 340 (11th Cir. 1994). However, the district court's discretion in limiting the scope of cross-examination is also subject to the requirements of the Sixth Amendment. Id.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. It guarantees criminal defendants an opportunity to impeach, through cross-examination, the testimony of witnesses for the prosecution. United States v. Baptista-Rodriguez, 17 F.3d 1354, 1366 (11th Cir. 1994). The importance of full cross-examination increases where the witness is the star government witness or participated in the crimes for which the defendant is being prosecuted. Taylor, 17 F.3d at 340. However, the defendant's right to

10

cross-examine witnesses is not without limitation, as she is entitled to only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 294 (1985).

"[O]nce there is sufficient cross-examination to satisfy the Sixth Amendment's Confrontation Clause, further questioning is within the district court's discretion." Taylor, 17 F.3d at 340. "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." United States v. Garcia, 13 F.3d 1464, 1469 (11th Cir. 1994); see also United States v. Haimowitz, 706 F.2d 1549, 1558–59 (11th Cir. 1983) (holding that the district court did not abuse its discretion in restricting defendant's ability to cross-examine witness regarding fraudulent documents he had executed where the jury had ample information regarding his credibility, including his prior convictions and that he was testifying under a plea agreement).

As Williams contends, the cross-examination of Duhaney was important to her defense because he was the government's star witness, and he was also a participant in the crime. See Taylor, 17 F.3d at 340. The district court, however, did allow Duhaney to answer several questions about the notes before it instructed

11

Williams' counsel to discontinue that line of questioning. During this testimony, Duhaney told the jury that he had taken notes from the book because he had borrowed it from someone, but he did not believe in what the notes said, even though he admitted to thinking "they were something."

In addition, Williams' had already extensively challenged Duhaney's credibility by questioning him on: (1) his prior convictions and violation of his supervised release; (2) his plea bargain with the government and the benefits he could obtain by testifying; and (3) the fact that he had lied about his participation in the conspiracy several times when he was initially questioned by the government. Because Williams' counsel had already presented the jury with substantial evidence to draw a fair inference about Duhaney's credibility, and Duhaney had already told the jury that he did not believe in what was stated in his notes from the book, a reasonable jury would not have received a different impression about his credibility had the district court permitted further questioning about the notes. Therefore, the district court did not abuse its discretion by limiting Williams' cross-examination of Duhaney on his notes. See Haimowitz, 706 F.2d at 1558–59.

## III.

Williams next contends that the district court improperly limited her closing

argument, in violation of her due process and fair trial rights, by instructing the jury that her counsel's explanation of reasonable doubt was inaccurate. Specifically, Williams argues that her counsel properly explained the concept of reasonable doubt by comparing it to a patient's desire to seek a second opinion when told by a doctor "you know, I'm looking at you and I think you need to have both of your legs amputated."

The conduct of a district judge during trial is reviewed only for an abuse of discretion. See United States v. Hall, 77 F.3d 398, 400 (11th Cir. 1996). "The district court has broad discretion over closing argument and will be reversed only if counsel is prevented from making all legal arguments supported by the facts." Id.

Defense counsel is entitled to apply the accepted definition of reasonable doubt to the facts of the case. Id. at 401. However, "[i]n arguing the law to the jury, counsel is confined to principles that will later be incorporated and charged to the jury." United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983). Therefore, counsel cannot argue "incorrect or inapplicable theories of law." United States v. Valdes-Guerra, 758 F.2d 1411, 1416 (11th Cir. 1985). Additionally, the district court can admonish counsel who make improper comments. United States v.

13

Jackson, 470 F.2d 684, 687 (5th Cir. 1972).[1]  "Such comments from the bench do not constitute reversible error unless they deprive the defendant of [her] right to an impartial trial."  Id.

The district court did not abuse its discretion in advising the jury that Williams' counsel's explanation of reasonable doubt was inaccurate.  It was that, and confusing as well.  The court instructed the jury that proof beyond a reasonable doubt is "proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the [most] important of your own affairs."  The court was permitted to tell the jury that Williams' counsel's example was inaccurate.  See Jackson, 420 F.2d at 687.

**IV.**

Williams also contends that the district court erred by improperly instructing the jury on the meaning of reasonable doubt.  Specifically, Williams argues that the example the district court judge did use to describe reasonable doubt, which had to do with open-heart surgery the judge had previously undergone, unconstitutionally changed the government's burden of proof.

We review de novo a challenge to the district court's jury instructions.

---

[1]  In our en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

14

United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993). "Generally, district courts have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts . . . ." United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (quotation marks and citation omitted). "[W]e will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." Id. (quotation marks and citation omitted). If the instructions accurately reflect the law, we give the trial court wide discretion in determining the style and wording of the instructions. Trujillo, 146 F.3d at 846. A jury is presumed to follow the district court's instructions. United States v. Chandler, 996 F.2d 1073, 1088 (11th Cir. 1993).

As we mentioned above, the court initially instructed the jury to the agreed-upon formulation that proof beyond a reasonable doubt is "proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the [most] important of your own affairs." Williams does not challenge that instruction, but instead argues that the district court judge's example improperly changed the government's burden of proof because it failed to state that the reliance on the proof must be without hesitation.

However, when Williams' counsel pointed out the omission, the court

15

immediately instructed the jury to ignore the example and repeated the initial, agreed-upon instruction. We presume that the jury followed the district court's instruction to ignore the example, see Chandler, 996 F.2d at 1088, and the court's remaining instructions accurately characterized the government's burden regarding reasonable doubt. Therefore, the district court did not err in its instructions to the jury on reasonable doubt. See Prather, 205 F.3d at 1270.

## V.

Finally, Williams and Dimson both contend that the district court imposed unreasonable sentences upon them. They argue that the district court placed undue influence on just one of the 18 U.S.C. § 3553 factors, the "seriousness of the offense," and failed to consider the lesser weight the court placed on the seriousness of the offense when it sentenced their co-conspirator, Duhaney.[2] Dimson also argues that the court erred in referencing his likelihood of recidivism as an explanation for an above-guidelines sentence without explaining how the guidelines did not adequately address his criminal history.

---

[2] Williams and Dimson also contend that the district court improperly relied on a fact not within the record, the annual revenue of Coca-Cola, in determining the seriousness of the offense. This argument is without merit. Contrary to their contention, the $24 billion figure the district court used was in the record, and the district court did not err by considering it in deciding whether the $1.5 million intended loss calculated under the guidelines underrepresented the seriousness of the offense. See United States v. Wilson, 183 F.3d 1291, 1301 (11th Cir. 1999) ("A court may consider any information (including hearsay), regardless of admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the information is sufficiently reliable.").

16

A.

Williams contends that her 96-month sentence, which is above the guidelines range, is unreasonable because although the court properly calculated the guidelines range, it then erred by: (1) placing undue influence on one of the § 3553(a) factors, the seriousness of the offense, to the exclusion of all others; (2) ignoring that her case is a "cookie-cutter" trade secrets case; and (3) creating an unwarranted disparity with Duhaney, who the court sentenced to 24 months imprisonment.

We review a final sentence imposed by a district court for reasonableness. United States v. Agbai, 497 F.3d 1226, 1229 (11th Cir. 2007). The reasonableness of a final sentence is reviewed only for an abuse of discretion. Gall v. United States, 552 U.S.___, 128 S. Ct. 586, 594 (2007). The district court must impose a sentence that is both procedurally and substantively reasonable. United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006).

The Supreme Court has explained that a sentence may be procedurally unreasonable if the district court improperly calculates the guideline range, treats the guidelines as mandatory, fails to consider the appropriate statutory factors, bases the sentence on clearly erroneous facts, or fails to adequately explain its reasoning. Gall, 128 S. Ct. at 597. The Court also suggested that review for

17

substantive reasonableness involves an inquiry into whether the factors in 18 U.S.C. § 3553(a) support the challenged sentence. See id. at 600.

If, after correctly calculating the guidelines range, a district court decides that a sentence outside that range is appropriate, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. at 597. Accordingly, the district court must "includ[e] an explanation for any deviation from the Guidelines range." Id. In determining whether a sentence is substantively reasonable, this Court must consider the totality of the circumstances. Id. If the sentence is outside the guidelines range, this Court may consider the deviation, "but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id.

"The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Id. (citation omitted). We have recognized that "there is a range of reasonable sentences from which the district court may choose," and the burden of establishing that the sentence is unreasonable in light of the record and the § 3553(a) factors lies with the party challenging the sentence. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). Nonetheless, the district court does not

have unfettered discretion in sentencing. <u>United States v. Pugh</u>, ___F.3d___, No. 07-10183, slip op. at 1090 (11th Cir. Jan. 31, 2008).

The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the kinds of sentences available; (6) the Sentencing Guidelines range; (7) pertinent policy statements of the Sentencing Commission; and (8) the need to avoid unwanted sentencing disparities. <u>See</u> 18 U.S.C. § 3553(a). While the district court must consider these factors in imposing the sentence, it is not required to discuss each factor. <u>Talley</u>, 431 F.3d at 786.

A district court's unjustified reliance on a single § 3553(a) factor may be a "symptom" of an unreasonable sentence. <u>See</u> <u>Pugh</u>, No. 07-10183, slip op. at 1090–91 (citation omitted). However, such a sentence is not necessarily unreasonable. <u>See</u> <u>Gall</u>, 128 S. Ct. at 600 (holding that a district court did not commit reversible error simply because it "attached great weight" to one factor). Indeed, "[t]he weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." <u>United States v. Clay</u>, 483 F.3d 739, 743 (11th Cir. 2007) (quotation omitted).

19

At Williams' sentence hearing, the district court discussed several of the §
3553(a) factors: (1) the fact that Williams had lied to the court about her previous
criminal history, 18 U.S.C. § 3553(a)(1); (2) the fact that she was well-educated
and did not need any additional vocational training, id. § 3553(a)(2)(D); (3) the
need to deter Williams and others from committing similar crimes, id. §
3553(a)(2)(B), (C); (4) the guidelines and policy statements, which the district
court did not find helpful because they did not deal with this kind of case, id. §
3553(a)(4), (5); (5) the need to protect the trade secrets of companies, id. §
3553(a)(2)(B), (C); and (6) the seriousness of the offense, id. § 3553(a)(2)(A). In
describing why it found the offense to be so serious, the court discussed the harm
that Coca-Cola could have suffered if Williams and her co-conspirators had
succeeded in selling its trade secrets to a rival, and the danger to the United States
economy these crimes pose.

Although the court attached great weight to one factor, the seriousness of the
offense, this does not mean that its sentence, which was below the statutory
maximum of 10 years imprisonment, was unreasonable. See Gall, 128 S. Ct. at
600. The district court justified its reliance on that factor by explicitly stating why
it found the offense to be so serious, and explaining that it did not believe the
guidelines properly addressed the offense and that the policy statements were not

20

helpful. Because the district court explained based on the § 3553(a) factors why it varied above the guidelines range, and it is within the district court's discretion to decide how much weight to give each § 3553(a) factor, see Clay, 483 F.3d at 743, Williams has not shown that her 96-month sentence was either procedurally or substantively unreasonable, see Gall, 128 S. Ct. at 597.

The fact that one of Williams' co-conspirators, Duhaney, received a substantially shorter sentence does not change this result. Although one of the § 3553(a) factors does require the court to "avoid unwarranted sentence disparities," 18 U.S.C. § 3553(a)(6), Duhaney pleaded guilty to conspiracy to commit theft of trade secrets pursuant to a written plea agreement, and his sentence reflected the substantial assistance he provided to the government by testifying against Williams. Therefore, Williams has not shown that her and Duhaney's situations are similar enough that the differences between their sentences are "unwarranted."

## B.

Dimson also has not shown that the district court imposed an unreasonable sentence on him. Like Williams, Dimson does not challenge the district court's calculation of his guidelines range. Instead, he contends that the district court erred in imposing a 60-month sentence, which was above the guideline range, by: (1) placing unwarranted emphasis on the seriousness of the offense to the

exclusion of the other § 3553(a) factors; (2) creating an unwarranted disparity with Duhaney's sentence; and (3) referencing Dimson's likelihood of recidivism as an explanation for an above-guidelines sentence without explaining how the guidelines did not adequately address his criminal history.

During Dimson's sentence hearing, the district court discussed several of the § 3553(a) factors, including: (1) Dimson's serious criminal record, 18 U.S.C. § 3553(a)(1); (2) the guidelines and policy statements, which the district court did not find helpful because they did not deal with this kind of case, id. § 3553(a)(4), (5); (3) the need to protect trade secrets of companies, id. § 3553(a)(2)(B), (C); and (4) the seriousness of the offense, id. § 3553(a)(2)(A). In terms of the seriousness of the offense, the district court repeated what it had told Williams, which focused on the severity of the harm that could have befallen Coca-Cola if the trade secrets had been sold to a rival, and the danger to the U.S. economy that these types of crimes pose.

As we mentioned above, the fact that the district court emphasized one § 3553(a) factor, the seriousness of the offense, does not mean that Dimson's sentence was unreasonable. See Gall, 128 S. Ct. at 600. In addition, although Dimson's previous offenses were included in his criminal history and were therefore part of the calculation of his guideline range, the court emphasized that

22

he had committed previous "fraud-related" crimes. This fits squarely into one of the § 3553(a) factors, the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1), and was therefore a proper basis for the court's consideration. See also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence.").

Dimson has also failed to show that a similarly situated defendant received a shorter sentence. Although he argues that the court created an unwarranted disparity with Duhaney's 24-month sentence, as we mentioned above, Duhaney provided substantial assistance to the government by testifying against Williams at her trial. Because Dimson did not provide any assistance to the government, there was no "unwarranted" disparity between his and Duhaney's sentences.

Just as when it sentenced Williams, the district court explained based on the § 3553(a) factors why it was varying upward from the guidelines range for Dimson's sentence, and it was within the court's discretion to give more weight to one § 3553(a) factor, the seriousness of the offense, than it gave to the other factors. See Clay, 483 F.3d at 743. Dimson has not met his burden of showing that his 60-month sentence, which was 5 years below the 10-year statutory

23

maximum, was either procedurally or substantively unreasonable.  See <u>Talley</u>, 431

F.3d at 788.

**AFFIRMED.**