[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14681

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

EDWAR RODRIGUEZ,
a.k.a. Domi,
a.k.a. Brooklyn,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00030-CEH-TGW-1

_____

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Edwar Rodriguez played several distinct roles in a large-scale methamphetamine drug trafficking conspiracy operating out of the Tampa Bay, Florida area. In this appeal, he disputes various building blocks of his 135-month prison sentence imposed by the district court. His primary challenge involves the trial court's determination that he was responsible for distributing 200 kilograms of methamphetamine. He also makes three other arguments on appeal -- concerning his sentencing enhancement for possessing a firearm, the district court's decision not to grant him a downward variance or downward departure, and the overall reasonableness of his sentence. After thorough review, we affirm the judgment of the district court.

I.

The essential facts drawn from the Presentence Investigation Report ("PSI") and an extended sentencing hearing held by the district court are these. From around January 1, 2018 through April 23, 2019, Edwar Rodriguez ("Rodriguez") participated in a variety of ways in a drug trafficking organization that procured cocaine and hundreds of kilograms of methamphetamine from a Mexican drug cartel and distributed these drugs in Spring Hill, Florida. Co-conspirators Juan Carlos Arias Castillo ("Castillo") and Adan Barajas Maldonado ("Maldonado") led the organization from a stash

house in Spring Hill, where authorities later found 13.38 kilograms of liquid methamphetamine, 380.2 grams of powdered methamphetamine, 145.1 grams of cocaine, one gram of heroin, two pistols, and ammunition.

Rodriguez principally served as an "errand runner" for the principals of the conspiracy. In this capacity, Rodriguez occasionally transported methamphetamine (imported from Mexico) by car from Texas all the way back to the conspirators' stash house in Florida. Rodriguez also distributed drugs to the organization's customers in the Spring Hill area -- a task that included delivering multi-kilogram quantities of methamphetamine to a local methamphetamine distributor on a weekly basis. Some of the time, Rodriguez distributed methamphetamine to the organization's customers by working in tandem with Christian Santiago-Rondon and Victor Santiago-Rondon (collectively, "the Santiago-Rondon brothers"), two others who also acted as errand runners for the conspiracy. On other occasions, Rodriguez served as Castillo's driver, chauffeuring Castillo as he personally distributed methamphetamine to customers in the same area. In addition to transporting and distributing drugs, Rodriguez regularly wired funds from Castillo and Maldonado to cartel contacts in Mexico. Occasionally, Rodriguez was tasked with recruiting individuals who were not affiliated with the conspiracy to send money wires, in an attempt to conceal these transactions from law enforcement. Castillo or Maldonado typically paid Rodriguez around $200 each time he completed his myriad tasks in Florida. He was also paid somewhere

between $3,500 and $4,000 for transporting methamphetamine from Texas to Florida.

In 2020, a federal grand jury sitting in the Middle District of Florida charged Rodriguez and five others with one count of conspiring to distribute and to possess with intent to distribute fifty grams or more of methamphetamine, as well as mixtures and substances containing detectable amounts of both cocaine and heroin, all in violation of 21 U.S.C. § 841(b)(1)(A)(viii) and (b)(1)(C) and 21 U.S.C. § 846. The government claimed that Rodriguez and his coconspirators were responsible for delivering more than 200 kilograms of methamphetamine to their customers. Rodriguez's offense carried a mandatory minimum sentence of ten years of imprisonment and a maximum sentence of life imprisonment. 21 U.S.C. § 841(b)(1)(A)(viii).

Rodriguez ultimately elected to plead guilty without the benefit of a written plea agreement, but disputed various statements contained in the PSI. In accord with the magistrate judge's recommendation, the district court accepted Rodriguez's guilty plea on September 18, 2020.

Relevant here, one of the facts Rodriguez disputed in the PSI was the assertion that Rodriguez had sold Castillo a pistol that was ultimately recovered from the stash house. Additionally, Rodriguez claimed that, for sentencing purposes, he should be held responsible only for 15 to 45 kilograms of methamphetamine, objecting to the PSI's recommendation that he be held accountable for the 200 kilograms attributed to the entire conspiracy. Rodriguez

also argued that he should not receive a sentencing enhancement for possessing weapons, under § 2D1.1 of the U.S. Sentencing Guidelines, because he did not sell a firearm to Castillo; that he should receive a downward departure under § 4A1.3 of the U.S. Sentencing Guidelines, because his criminal history overrepresented the seriousness of his prior crimes; and that he deserved a downward variance from the applicable U.S. Sentencing Guidelines range, "based on his personal history and the specific offense characteristics," including his "excellent work history" and his ongoing support of his son and his girlfriend's two other children.

The PSI calculated a total offense level of thirty-nine under §§ 2D1.1(a)(5) and 2D1.1(c)(1) of the U.S. Sentencing Guidelines, based on the quantities of methamphetamine for which Rodriguez was held responsible, Castillo's possession of a firearm, Rodriguez's lack of a mitigating role, and, cutting in the other direction, his acceptance of responsibility. The PSI placed Rodriguez in criminal history category III on account of his prior convictions for aggravated assault and possession of marijuana. Coupled with his projected total offense level of thirty-nine, this resulted in a Guidelines sentencing range of 324 to 405 months.

After taking sworn testimony from Rodriguez and hearing argument from counsel, the district court found that Rodriguez had been engaged in a jointly undertaken criminal activity, "as opposed to a number of separate criminal activities," with Castillo, Maldonado, and other co-conspirators. The court added, "looking at the conspiracy as a jointly undertaken criminal activity, it's clear

that the [c]ourt should consider the actions of others in the conspiracy unless the [d]efendant is no longer a part of the conspiracy." Consistent with these statements, the court overruled several of Rodriguez's objections to the PSI.  Among other things, the court rejected Rodriguez's objection to the attribution of 200 kilograms of methamphetamine to him.  The trial court also overruled his objection to the firearm enhancement, finding that, while the government had not proven that Rodriguez sold a pistol to Castillo, Rodriguez was a part of the conspiracy at the time of the search of the stash house from whence the firearm was retrieved, and that Castillo's possession of a pistol was foreseeable.

The court then ruled in Rodriguez's favor on several other issues.  For one thing, it found that Rodriguez was entitled to a sentence reduction in light of his minor role.  The court observed that, based on Rodriguez's testimony, he was "just a mule with regard to this drug trafficking organization," and "conspirators who were higher up" in the organization "told him what to do."  Rodriguez argued that, in light of the district court's finding that he played a minor role, a sentencing enhancement for the importation of methamphetamine was not viable.  The district court agreed with him on this issue as well.

Rodriguez was left with an offense level of thirty-one. When coupled with a criminal history category of III, this yielded a Sentencing Guidelines range of 135 to 168 months, a supervised release range of two to five years, and a fine range of $30,000 to $10 million.   The district court denied Rodriguez's request for a

variance and sentenced him to 135 months' imprisonment -- a sentence at the bottom of the Guidelines range -- followed by three years of supervised release and a $100 special assessment but no fine.

This timely appeal followed.

## II.

We review a district court's findings of fact at sentencing, including the quantity of drugs that are attributable to a defendant, for clear error. *United States v. Westry*, 524 F.3d 1198, 1218 (11th Cir. 2008); *see also United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014). Under this deferential standard, we will reverse for clear error only when we are "left with a definite and firm conviction that a mistake has been committed." *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012) (citation and quotation marks omitted). When a challenge to the veracity of the facts in a PSI is brought by a defendant, the burden of proving those facts by a preponderance of the evidence lies with the government. *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995).

While a district court "does not have unfettered discretion" in setting a sentence, the reasonableness of a final sentence is reviewed only for abuse of discretion. *United States v. Williams*, 526 F.3d 1312, 1321–22 (11th Cir. 2008); *see also Gall v. United States*, 552 U.S. 38, 51 (2007) (explaining that we review both the procedural and substantive reasonableness of a criminal sentence for abuse of discretion). A district court abuses its discretion when it

(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors. *United States v. Pugh*, 515 F.3d 1179, 1192 (11th Cir. 2008).  Normally, however, the "weight" that a district court gives to "any given § 3553(a) factor is a matter committed to the sound discretion of the district court." *Williams*, 526 F.3d at 1322 (quotation marks omitted) (quoting *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007)).

### III.

### A.

First and foremost, Rodriguez claims that the district court erred in attributing 200 kilograms of methamphetamine -- the total quantity of methamphetamine attributed to the conspiracy -- to him for sentencing purposes.  We are unpersuaded.

We note, at the outset, that Rodriguez does not dispute the district court's determination that he was still a member of the conspiracy at the time of his arrest.  To the extent Rodriguez claims that he "'quit' working for the conspiracy before the search warrant was executed," so "he should only be accountable for the drugs he actually delivered," this brief statement does not sufficiently challenge the district court's finding concerning the nature and extent of his membership in the conspiracy.  As we've said many times, an appellant abandons an issue when he makes only a "passing reference" to it in his opening brief, as Rodriguez did here.  *Sapuppo*

v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014) (quotation marks omitted).  Regardless, in order to sustain a legally cognizable withdrawal from a conspiracy, a defendant must "tak[e] steps inconsistent with the conspiracy and communicat[e] these acts in a manner reasonably calculated to reach the coconspirators, or disclos[e] the illegal activity to law enforcement authorities." United States v. Butler, 41 F.3d 1435, 1446 (11th Cir. 1995).  Simply being unavailable to perform a job for Castillo on the day the stash house was searched is neither the functional equivalent of thwarting or exposing the purposes of the conspiracy, or of explicitly informing the co-conspirators of his withdrawal.

We also conclude, as a preliminary matter, that the district court did not err in attributing 200 kilograms of methamphetamine to the drug trafficking organization as a whole.  Under our case law, the government meets its burden of establishing the relevant drug quantity by a preponderance of the evidence by convincing "the trier of fact . . . that the existence of a fact is more probable than its nonexistence." United States v. Trainor, 376 F.3d 1325, 1331 (11th Cir. 2004) (quoting Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993)).  In making this showing, the government must present "reliable and specific evidence." Lawrence, 47 F.3d at 1566.  When "a fact pattern gives rise to two reasonable and different constructions, 'the factfinder's choice between them cannot be clearly erroneous.'" Almedina, 686 F.3d at 1315 (quoting United States v. Izquierdo, 448 F.3d 1269, 1278 (11th Cir. 2006)).

Here, the total drug quantity attributed to a conspiracy that ran from around January 1, 2018 through April 23, 2019 was based upon: (1) a co-conspirator's delivery of roughly thirteen kilograms of liquid methamphetamine seized on the day the government searched the stash house; and (2) a ledger recovered in that search, which showed that the conspiracy had distributed approximately 190 kilograms of methamphetamine throughout a six- to seven-week period during the course of the fifteen-month conspiracy. Rodriguez argues vaguely that the 200-kilogram "amount was based on mere speculation and not facts." However, Rodriguez offers no evidence to suggest that the district court was unreasonable, let alone that it clearly erred in finding, based on these two reliable, specific sources of evidence, that the conspiracy had moved at least 200 kilograms of methamphetamine. *See Reeves*, 742 F.3d at 506–07 (upholding a district court's finding of a total quantity of drugs when this finding was solely based on a co-conspirator's testimony about how many drugs he had sold the defendant). Quite simply, there is no basis on this record for us to find that the total quantity determination reflected any clear error.

We turn then to Rodriguez's main claim -- that the district court committed clear error in attributing the full 200 kilograms of methamphetamine to him for sentencing purposes. In *United States v. Ismond*, we addressed how to assign a drug quantity for sentencing purposes to a member of a drug conspiracy like this one. 993 F.2d 1498, 1499 (11th Cir. 1993).

We explained that "in the case of a *jointly undertaken* criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," *see* U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added), "a member of a drug conspiracy is liable for his own acts and the acts of others in furtherance of the activity that the defendant agreed to undertake and that are reasonably foreseeable in connection with that activity." *Ismond*, 993 F.2d at 1499. Thus, in order to ascertain whether a defendant should be held liable for the drug quantities handled by his co-conspirators, a district court must make findings about: (1) the overall scope of the drug-related enterprise; (2) a particular defendant's individualized role in relation to the overall scope of the enterprise; and (3) the quantity of drugs that would be reasonably foreseeable to a defendant in light of his role in the enterprise. *See id.*

In assessing the scope of the conspiratorial enterprise, a district "court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *See* App. Notes 2, 3(B) to U.S.S.G. § 1B1.3. And, importantly, a district court's failure to make individualized findings regarding a defendant's scope of criminal activity does not necessarily warrant a remand; in that event, "the sentence *may nevertheless be upheld* if the record supports the amount of drugs attributed to a defendant." *Ismond*, 993 F.2d at 1499 (emphasis added). Here, the record amply supports the district court's attribution of 200 kilograms of methamphetamine to defendant Rodriguez.

Looking first at the scope of the conspiracy, the PSI established that the drug conspiracy was a large importation/distribution enterprise, in which runners would regularly drive drugs -- mostly methamphetamine, along with some cocaine -- across the border from Mexico to Texas, then to a stash house in Spring Hill, Florida; then distribute drugs from the stash house to the Spring Hill customers; and, finally, wire money back to drug cartels in Mexico. Notably, Rodriguez does not dispute the veracity of any of these facts. *See United States v. Hedges*, 175 F.3d 1312, 1315 (11th Cir. 1999) (permitting a district court to rely on statements from the PSI that are "undisputed"). We, therefore, accept the manner in which the district court framed the scope of the conspiracy. *See United States v. Wade*, 458 F.3d 1273, 1277 (11th Cir. 2006) (citations omitted) ("It is the law of this circuit that a failure to object to allegations of fact in a PSI admits those facts for sentencing purposes. It is also established law that the failure to object to a district court's factual findings precludes the argument that there was error in them.").

As for the second step -- the defendant's individualized role in relation to the conspiracy's overall scope -- the district court expressly found that the entire conspiracy could be classified as "a jointly undertaken criminal activity" akin to one described in the U.S. Sentencing Guidelines' commentary. In this example:

> Defendants T, U, V, and W are hired by a supplier to backpack a quantity of marihuana across the border from Mexico into the United States. Defendants T, U,

> V, and W receive their individual shipments from the supplier at the same time and coordinate their importation efforts by walking across the border together for mutual assistance and protection. Each defendant is accountable for the aggregate quantity of marihuana transported by the four defendants. The four defendants engaged in a jointly undertaken criminal activity, the object of which was the importation of the four backpacks containing marihuana (subsection (a)(1)(B)), and aided and abetted each other's actions (subsection (a)(1)(A)) in carrying out the jointly undertaken criminal activity (which under subsection (a)(1)(B) were also in furtherance of, and reasonably foreseeable in connection with, the criminal activity).

App. Note 4(C)(viii) to U.S.S.G. § 1B1.3.

Likening Rodriguez's conspiracy to the "example in the guidelines with [d]efendants T, U, V and W," the district court emphasized that the co-defendants here "worked jointly," and that "this case is one that's viewed more as a jointly undertaken criminal activity as opposed to a number of separate criminal activities." The court added that "Mr. Rodriguez at times was even in the vehicle with Castillo or Maldonado or maybe even worked with the . . . Santiago Rondon brothers," who were other runners in the conspiracy.

The record -- as we've laid it out -- fully supports these findings by the district court.    First, Rodriguez transported

methamphetamine from the Texas-Mexican border all the way back to the stash house in Florida. Second, he distributed methamphetamine to the organization's Florida customers based on orders he received from Castillo. Third, he occasionally partnered with the Santiago-Rondon brothers to distribute methamphetamine to customers. Fourth, he drove Castillo on multiple errands when Castillo distributed methamphetamine to his customers. Fifth, Rodriguez was the primary distributor of methamphetamine to Donald Shaffer, another distributor who received multi-kilogram quantities of methamphetamine from Rodriguez on a weekly basis. Finally, Rodriguez received payments for wiring funds from the conspirators to their cartel contacts in Mexico. In short, the record reflects that Rodriguez acted jointly with his co-conspirators by participating in the conspiracy in six distinct ways, five of which involved directly transporting controlled substances.

Because Rodriguez worked extensively in partnership with other members of this elaborate drug conspiracy, he properly was held responsible for his co-conspirators' actions. Indeed, this is not a case where a district court, without support in the record, loosely assigned the total quantity of drugs or funds handled by a conspiracy to each individual defendant, or evenly divided an estimated total quantity across several different defendants. *See, e.g., United States v. Hansley*, 54 F.3d 709, 714 (11th Cir. 1995); *United States v. Hunter*, 323 F.3d 1314, 1321–22 (11th Cir. 2003).

Instead, this case more closely resembles those circumstances where we've upheld a district court's deliberate decision to

attribute a conspiracy's full quantity of drugs to a defendant. Thus, for instance, in *United States v. Matthews*, we upheld the trial court's sentencing decisions when the government provided specific evidence about each defendant's respective role in a drug distribution conspiracy and attributed a quantity of cocaine distributed by a co-conspirator to the defendant on account of the defendant's large role in the conspiracy. 168 F.3d 1234, 1248 (11th Cir. 1999). And in *United States v. Mertilus*, we affirmed a district court's decision to hold a defendant liable for a quantity of cocaine that he "aided" in selling because he had "participated" in the two sales, even though they were carried out by other co-conspirators. 111 F.3d 870, 873 (11th Cir. 1997).

Here, as in those cases, Rodriguez's involvement was not limited to a single discrete act or a single discrete phase of this elaborate conspiracy. Rodriguez's multiple drives to the Texas border and to customers within Florida -- and in particular his pattern of directly driving Castillo to customers' homes -- clearly illuminate the role he played in aiding Castillo in the distribution of methamphetamine.

Finally, the third step of our inquiry asks whether the actions of Rodriguez's co-conspirators were reasonably foreseeable, and, therefore, whether the quantity of drugs they distributed should be attributable to him. To begin with, the district court's attribution of 200 kilograms of methamphetamine to the drug trafficking organization was supported by two reliable, specific sources of evidence we've discussed: thirteen kilograms of methamphetamine

that were seized in the search of the stash house, and the other 190 kilograms or so that were recorded in a ledger found in the stash house. And if anything, the record suggests that this quantity determination is a major underestimate. The drug ledger in the stash house covered only a seven-week period, whereas the conspiracy lasted for some fifteen months.

Rodriguez argues, nevertheless, that the district court's determination that he played a "minor role" in the conspiracy implies or compels the conclusion that he could not be held responsible for the full 200 kilograms of methamphetamine. However, as Rodriguez's counsel conceded at oral argument, those two determinations are not necessarily mutually exclusive. A participant in a conspiracy may be "substantially less culpable than the *average participant* in the criminal activity," a necessary requirement for a finding of a minor role, *see United States v. Cruickshank*, 837 F.3d 1182, 1194 (11th Cir. 2016) (emphasis added) (citation and quotation marks omitted), while also still being sufficiently involved in the conspiracy's scope to be considered a joint participant who may be held culpable for the full quantity of drugs attributed to a conspiracy. Here, the record supports both determinations.

As for the reasonable foreseeability finding prescribed by *Ismond*, the district court commented that:

> [A]ll acts and omissions of others that were within the scope of the jointly undertaken criminal activity in furtherance of that criminal activity and reasonably foreseeable in connection with that criminal activity

can also be considered and attributed to Mr. Rodriguez[.]

See Ismond, 993 F.3d at 1499; see also Butler, 41 F.3d at 1443 ("[T]he Guidelines require a district court to attribute to a defendant all drugs foreseeably distributed pursuant to a common scheme of which that defendant's offense of conviction was a part.").  And ultimately, the district court found that Rodriguez was responsible for the 200-kilogram amount, expressly overruling Rodriguez's "objection to being held accountable for more than 200 kilograms of methamphetamine."

The district court's findings are, once again, well supported. The record we've detailed reveals Rodriguez's months-long participation in a scheme to distribute methamphetamine to various customers, where he directly collaborated with the other co-conspirators on a regular basis.  On this record, we are not "left with a definite and firm conviction" that the district court clearly erred in concluding that Rodriguez reasonably could have foreseen the distribution of 200 kilograms of methamphetamine by his organization. See United States v. Rothenberg, 610 F.3d 621, 624 (11th Cir. 2010) (quotation marks omitted).  Indeed, "[w]here a fact pattern gives rise to two reasonable and different constructions, 'the factfinder's choice between them cannot be clearly erroneous.'" Almedina, 686 F.3d at 1315 (quoting Izquierdo, 448 F.3d at 1278).

One final comment: The district court did not recite each aspect of Rodriguez's testimony that supported its findings as to the scope of the conspiracy and Rodriguez's role in it, nor did it add

as many details to its findings as it could have.  Nevertheless, we are satisfied that it would be too formalistic to require the district court to do so in this case, where the court made its decisions based on an extensive evidentiary record and a sentencing hearing at which Rodriguez testified at length about his wide-ranging participation in the conspiracy.  The district court recognized as much, saying this:

> I've considered the argument of your Counsel, his sentencing memorandum, your testimony and your statement, the letters in support that the [c]ourt received and reviewed on your behalf, argument of Counsel for the Government, and it's taken us a long time to get there, two hours almost with regard to this, but the [c]ourt has certainly considered adequate information from which to impose a sentence in this case given your role in this conspiracy.

And as we've explained at some length, the record provided more than adequate support for each of the findings necessary for the court to hold Rodriguez liable for the drug quantities handled by the conspiracy.  This approach is, after all, consistent with *Ismond*'s assurance that a "sentence may nevertheless be upheld if the record supports the amount of drugs attributed to a defendant." *See* 993 F.2d at 1499.  Like the district court, we cannot ignore the extensive evidence of Rodriguez's role in this conspiracy, nor can we say that the district court's findings concerning Rodriguez's role were clearly erroneous.  Thus, we affirm the district court's

decision to attribute 200 kilograms of methamphetamine to Rodriguez for sentencing purposes.

### B.

Similarly, we are unconvinced by Rodriguez's challenge to a sentencing enhancement for possessing a firearm. As we see it, the district court was justified in enhancing Rodriguez's sentence on the grounds that his co-conspirator Castillo had stored a firearm at the stash house.

In *United States v. Gallo*, we explained that a defendant may receive a sentencing enhancement for possession of a firearm by a co-conspirator if:

> (1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, *and* (4) the co-conspirator['s] possession was reasonably foreseeable by the defendant.

195 F.3d 1278, 1284 (11th Cir. 1999) (emphasis in original). While the district court's imposition of a sentencing enhancement is reviewed deferentially for clear error, the government still must establish the necessary facts "by a preponderance of the evidence." *Id.* However, "[o]nce the government shows that a firearm is present at the site of the charged conduct, the evidentiary burden shifts to the defendant to show that a connection between the firearm

and the offense is clearly improbable." *Westry¸* 524 F.3d at 1221 (citations and quotation marks omitted).

In his brief, Rodriguez cites the four-part *Gallo* standard, and concedes that "[i]t is quite clear that the government has proven the first three elements," but argues that the government did not establish that Rodriguez "knew or could foresee that one of his co-conspirators had a weapon[.]" However, during the sentencing hearing, Rodriguez effectively admitted that it was reasonably fore-seeable that Castillo could possess a firearm. In response to the government's questions, Rodriguez agreed that (1) he knew he was a participant in the distribution of illegal drugs, (2) the drug trade was dangerous, and (3) "pretty much everybody involved in the drug business carries a firearm or has one accessible." Further, when explicitly asked whether he "could foresee it that Mr. Castillo might want a firearm handy in case somebody would try to rob him," Rodriguez answered, "I could see that, yes, correct."

Rodriguez's statements about reasonable foreseeability are especially strong admissions in light of his participation in a large-scale drug distribution conspiracy that spanned an extensive timeframe and covered a large geographic area bounded by the Texas-Mexican border and central Florida. *See United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006) (explaining that it is "reasonably foreseeable that a co-conspirator would possess a fire-arm where the conspiracy involved trafficking in lucrative and ille-gal drugs"). Finally, Rodriguez failed to mention, much less meet, his burden of showing that the "connection between the firearm"

found at the stash house "and the offense is clearly improbable." *See Westry*, 524 F.3d at 1221 (quotation marks omitted).

In short, we can discern no reason to find that the district court committed any mistake, let alone clearly erred in attaching a two-level enhancement to Rodriguez's sentence.

C.

As for Rodriguez's argument that the district court erroneously failed to grant him a downward departure from the Guidelines sentence, the government correctly points out that we lack jurisdiction to consider this element of Rodriguez's appeal.

Section 4A1.3 of the U.S. Sentencing Guidelines provides that:

> If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

U.S.S.G. § 4A1.3(b)(1). On appeal, Rodriguez argues that the district court erred in rejecting his "argument that he was entitled to a downward departure due to his criminal history being over-represented due to the charges against him." He points out that his criminal history score was based in part on a charge that he incurred at the age of nineteen, which was over twelve years ago.

However, the problem for Rodriguez is that the district court's decision to grant a defendant a downward departure is committed to the court's discretion, and we generally lack jurisdiction to review district courts' discretionary decisions in this area. In *United States v. Dudley*, for example, we addressed a criminal defendant's argument that the district court had erroneously denied his motion for a downward departure due to his HIV status. 463 F.3d 1221, 1228 (11th Cir. 2006). In so doing, we emphasized our clear rule that "[w]e lack jurisdiction to review a district court's decision to deny a downward departure unless the district court *incorrectly believed that it lacked authority* to grant the departure." *Id.* (emphasis added) (citing *United States v. Winingear*, 422 F.3d 1241, 1245 (11th Cir. 2005)). We have reiterated this rule many times. *See, e.g., United States v. Norris*, 452 F.3d 1275, 1282 (11th Cir. 2006); *United States v. Patterson*, 15 F.3d 169, 171 (11th Cir. 1994).

The exception to the rule -- that we have jurisdiction when a district court believes it lacked authority to grant a downward departure -- is a narrow one. So, in invoking the exception, we maintain a presumption in the district court's favor. *Dudley*, 463 F.3d at 1228. We do not require a district court to expressly say whether it believes it has the authority to grant a departure; instead, "when nothing in the record indicates otherwise, we assume the sentencing court understood it had authority to depart downward." *United States v. Chase*, 174 F.3d 1193, 1195 (11th Cir. 1999). In other words, we lack the power to review this decision when the

court does "not express any ambivalence regarding its authority to depart and the evidence does not otherwise reflect the district court misapprehended its authority." *Id.*; *cf. United States v. Webb*, 139 F.3d 1390, 1395 (11th Cir. 1998) (vacating and remanding on a downward departure issue solely to enable the district court to exercise its discretion over whether to grant a departure, since, during the sentencing hearing, "the court appears to have agreed with [ ] the proposition that it lacked the authority to depart" from the Guideline sentence).

Applying our clear-cut rule to this case, we can find no basis to conclude that the sentencing judge incorrectly understood her discretion to grant a downward departure. The judge's statement at sentencing that she "considered the argument of [defense] Counsel, his sentencing memorandum," Rodriguez's testimony, "the letters in support that the Court received and reviewed on [Rodriguez's] behalf, [and] argument of Counsel for the Government" indicates a thorough decision-making process and does not reflect any misunderstanding about her discretion under the Sentencing Guidelines. And Rodriguez has not pointed to any evidence suggesting otherwise.

Accordingly, we do not consider Rodriguez's arguments on this issue.

## D.

Lastly, we conclude that the district court did not abuse its discretion by assigning Rodriguez a substantively unreasonable

sentence.  Nor, moreover, did the district court abuse its discretion by declining to grant his request for a downward variance.

A sentence may be *substantively* unreasonable "if it is grounded solely on one factor, relies on impermissible factors, ignores relevant factors" in the sentencing context, or balances the relevant factors in an unreasonable manner.  *Pugh*, 515 F.3d at 1194; *see also United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc).  However, "it is only the rare sentence that will be substantively unreasonable." *United States v. McQueen*, 727 F.3d 1144, 1156 (11th Cir. 2013). *Procedural* unreasonableness may be evident when "the district court improperly calculates the guideline range, treats the guidelines as mandatory, fails to consider the appropriate statutory factors, bases the sentence on clearly erroneous facts, or fails to adequately explain its reasoning." *Williams*, 526 F.3d at 1322.

In reviewing a sentence for substantive reasonableness, we must take into account "the totality of the circumstances, including the extent of any variance from the Guidelines range," giving due deference to the district court's consideration of the sentencing factors enumerated in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 51.  However, in its "consideration of the § 3553(a) factors, the district court does not need to discuss or state each factor explicitly." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).  These are the § 3553(a) factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range [as set forth in the Sentencing Guidelines] . . . ; (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . . ; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

We consider whether the sentence as a *whole* is reasonable, rather than applying "the reasonableness standard to *each individual* decision made during the sentencing process." *United States v. Campbell*, 491 F.3d 1306, 1313 (11th Cir. 2007) (emphasis added) (quoting *Winingear*, 422 F.3d at 1245). Further, "the burden of establishing that the sentence is unreasonable in light of the record and the § 3553(a) factors *lies with the party challenging the sentence*." *Williams*, 526 F.3d at 1322 (emphasis added).

In objecting to the substantive reasonableness of his sentence and the district court's decision not to impose a downward variance,[1] Rodriguez begins by making several vague arguments that are unsupported by the record.  He claims that the district court erred by not properly considering the § 3553(a) factors, "fail[ing] to balance said factors so as to assure that a just and reasonable sentence was entered," and basing his sentence on "'impermissible factors', i.e., the District Court's knowledge and disdain for the conspiracy itself."  Rodriguez also offers the judgment that his "sentence did not promote the administration of justice nor law" and "did not provide just punishment[.]"  However, Rodriguez does not cite any specific portions of the record that support any of these claims about unreasonableness, and he does not explain how the district court should have assigned weight in a different way to the § 3553(a) factors in calculating his sentence.

Rodriguez's more specific objections to the substantive reasonableness of his sentence can essentially be grouped into four categories: (1) Rodriguez was a minor participant in the drug conspiracy; (2) he assisted the government and accepted responsibility; (3) he received a greater sentence than similarly situated co-

---

[1] Although Rodriguez raises the district court's denial of his request for a variance as a separate issue on appeal, this issue is more appropriately analyzed within the context of the reasonableness of his overall sentence.  *See Gall*, 552 U.S. at 51 (considering "the extent of any variance from the Guidelines range" in the process of assessing reasonableness); *Irey*, 612 F.3d at 1186 (same).

conspirators; and (4) on a personal level, he has a positive history of working in lawful jobs and supporting his family.

These arguments also fall flat. First, Rodriguez overlooks that he already received sentencing reductions for having played a minor role in the drug enterprise and for having accepted responsibility. Next, Rodriguez's claim that he was assigned a higher sentence than the other co-conspirators is not in itself evidence of an unwarranted sentencing disparity. A variety of factors specific to individual defendants -- such as the defendants' criminal history, their personal characteristics, and the degree of their assistance to the government -- contributes toward their sentences, and Rodriguez provides no evidence that these factors were equivalent for himself and his co-defendants. On the contrary, as the government points out, the Santiago-Rondon brothers had lower criminal history categories of I, a salient fact that Rodriguez does not dispute. Nor does Rodriguez cite any precedent for the idea that a district court must reduce a defendant's sentence because of a record of gainful employment or strong familial ties. Moreover, as we've said many times, the weight given to any of the § 3553(a) factors is committed to the sound discretion of the district court. *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016). Under the deferential review standard we apply to the district court's sentence, we see no basis to second-guess its reasoned decisions about how to apply each specific § 3553(a) factor in this case.

Overall, Rodriguez has failed to show that his 135-month sentence was substantively unreasonable. Indeed, the fact that his

sentence is at the bottom end of the Guidelines range, and is well below the statutory maximum penalty of a life sentence, lends further support to the conclusion that it is reasonable. *See Gonzalez*, 550 F.3d at 1324 (noting that the defendant's sentence is situated "well below the maximum ten-year sentence" that accompanies his offense as one factor pointing toward reasonableness).[2]

**AFFIRMED**.

---

[2] Although Rodriguez says that his sentence was "procedurally" unreasonable in both his opening and reply briefs on appeal, he does not provide us with any evidence of procedural error in the sentencing process. Accordingly, he has abandoned the argument on appeal. *Sapuppo*, 739 F.3d at 681.